ATTORNEY GENERAL *vs.* PRESIDENT AND FELLOWS OF
HARVARD COLLEGE.

Suffolk.    October 7, 1965. — January 31, 1966.

Present: SPALDING, WHITTEMORE, CUTTER, KIRK, & SPIEGEL, JJ.

*Trust,* Charitable trust.    *Charity.    Harvard University.    Arnold Arbore-
tum.    Equity Jurisdiction,* Retention of jurisdiction.    *Equity Pleading
and Practice,* Decree, Suit to enforce charitable trust.

Where a fund was given to Harvard University under an indenture of
    trust providing that the fund should be used for the establishment and
    support of an arboretum at a location in Boston some distance from
    Cambridge, to be called the Arnold Arboretum and to "contain . . . the
    trees, shrubs and herbacious plants . . . which can be raised in the open
    air" at such location, and for the support of an "Arnold Professor"
    managing the arboretum and teaching in the university, and it appeared
    that over a period of years after the establishment of the arboretum it
    had come to be regarded as a separate institution and had acquired a
    high reputation and prestige as such, it was held that the university was
    not legally obligated to manage the arboretum as a separate institution
    unrelated to other similar activities of the university [136–137, 138];
    SPIEGEL, J., joined by KIRK, J., dissenting.
Upon a gift of a fund to a university on a public charitable trust for a
    specified activity thereof, there is an implied intent that the managers of
    the university shall determine in their best judgment what policies, con-
    sistent with the express trust provisions, will most serve the public as
    the ultimate beneficiary of such a trust.    [137–138]
Where a fund was given to the Harvard University corporation under an
    indenture of trust providing that the fund should be used for the estab-
    lishment and support of an arboretum at a location in Boston some dis-
    tance from Cambridge, to be called the Arnold Arboretum and to "con-
    tain . . . the trees, shrubs and herbacious plants . . . which can be
    raised in the open air" at such location, and for the support of an
    "Arnold Professor" to manage the arboretum and teach in the univer-
    sity, and that the fund should "not be diminished by supplementing any
    other object," and it appeared that, after the arboretum over the years
    had come to be regarded as a separate institution and had acquired a
    high reputation and prestige as such, the corporation transferred the
    bulk of the arboretum's library and herbarium to Cambridge to be
    merged with another library and another herbarium and housed in a
    new central building, a reasonable portion of whose maintenance and
    operating expense was to be charged to the arboretum endowment, that
    the transfer was made by the corporation in the belief that it would be

consistent with the corporation's trust obligations to the arboretum and "in the best interests of" the arboretum and also "would promote the science of botany as a whole at Harvard," and that the transfer impaired the separate reputation and prestige of the arboretum, it was held that in the circumstances the transfer did not constitute a breach of the arboretum trust [142–145]; SPIEGEL, J., joined by KIRK, J., dissenting. In a suit in equity involving the issue whether a transfer by the Harvard University corporation of the bulk of the library and herbarium of the Arnold Arboretum from the arboretum's premises in Boston to Cambridge to be merged and housed there with another library and herbarium constituted a breach of the trust under which the corporation had acquired the endowment for the establishment and support of the arboretum, this court, upon adjudging that there was no breach of trust, ordered that the trial court retain jurisdiction in order to ensure compliance with particulars of the corporation's resolution for the transfer requiring retention of a working library and herbarium at the premises in Boston and appropriate identification of the books and specimens removed to Cambridge as arboretum items, and that a final decree enter upon such compliance.  [145–146]

INFORMATION IN EQUITY filed in the Supreme Judicial Court for the county of Suffolk on December 4, 1958.

The suit was reserved and reported by *Spalding, J.*

*John K. Mallory, Jr.,* of the District of Columbia (*Thomas H. Mahony & Thomas V. Rankin,* Special Assistant Attorneys General, *& Richard W. Hulbert,* of New York, with him) for the Attorney General.

*Warren F. Farr* (*Donald R. Grant* with him) for the respondent.

WHITTEMORE, J.  This information in equity to enforce a trust, brought by the Attorney General at the relation of members of the Association for the Arnold Arboretum, Inc., challenges the acts of the defendant under a resolution of January 19, 1953, in removing to Cambridge, from the Arnold Arboretum premises in the Jamaica Plain district of Boston, the bulk of the library and herbarium of the Arboretum.  The basic issue is whether this removal was a breach of the trust under which the Arnold Arboretum was established and developed.  The facts are found in a master's report.

Interlocutory decrees were entered in the county court, denying the defendant's motions in respect of the master's

report, overruling its exceptions thereto and confirming the report. A reservation and report by the single justice[1] presents these decrees for review as well as the substance of the final decree appropriately to be entered. The master's report is well organized, clear, and complete, and we dispose of the case thereon.

The trust is set out in an Indenture dated March 29, 1872, by which the trustees under the will of James B. Arnold of New Bedford gave to the President and Fellows of Harvard College (the Corporation) a fund that, by the will, was to be "applied for the promotion of Agricultural or Horticultural improvements, or other Philosophical or Philanthropic purposes."

There were negotiations preliminary to the execution of the Indenture. George B. Emerson, one of James Arnold's trustees, in a letter to the acting president of Harvard, in March, 1869, had stated his desire "if possible, to have an arboretum — and for Harvard College"; also, if land could be found near the college, to establish the arboretum in Cambridge as an appendage to the Botanic Garden. Emerson and the two other trustees, John J. Dixwell and Francis E. Parker, had been closely associated with Harvard.

The 1872 Indenture required that the Corporation should accumulate income until the principal should be $150,000 and until the Bussey land at West Roxbury (now Jamaica Plain) thereinafter described should come into the full and free possession of the Corporation and that thereafter the Corporation should devote ninety-five per cent of "the said nett income in every year, to the establishment and support of an Arboretum,[2] to be called the Arnold Arboretum, which shall contain, as far as is practicable, all the trees, shrubs and herbaceous plants, either indigenous or exotic which can be raised in the open air at the said West Roxbury, . . .

---

[1] With the approval of the parties, the single justice, Mr. Justice Spalding, sat with the full court for the decision of the case.

[2] An arboretum is defined in Webster's Third New International Dictionary as "a place where trees, shrubs, and herbaceous plants are cultivated for scientific and educational purposes."

and to the support of a Professor, to be called the Arnold Professor, who shall have the care and management of the said Arboretum, subject to the same control by the said President and Fellows to which the professors in the Bussey Institution are now subject, and who shall teach the knowledge of trees in the University which is in the charge of the said President and Fellows, and shall give such other instruction therein as may be naturally directly and usefully connected therewith.'' The Indenture further provides: ''And as the entire fund, increased by the accumulations above named, under the best management and with the greatest economy, is barely sufficient to accomplish the proposed object, it is expressly provided that it shall not be diminished by supplementing any other object, however meritorious, or kindred in its nature. But the said President and Fellows shall be allowed to obtain from said Arboretum, free of cost, any trees, shrubs, and herbaceous plants, which, in the judgment of the Arnold Professor, can be spared from said Arboretum, without injury thereto; the same to be used for the ornament of the college grounds, at Cambridge or elsewhere.'' A following article provided that for ''the purpose of ascertaining the said nett income, it is agreed that the fund shall be subject to no charge, except for actual expenses; and in the management of the said fund, it is to be charged only such a part of the actual expense of managing the property of the college, as the said fund bears to the entire property of the College.''

The Corporation by the 1872 Indenture agreed to dedicate exclusively to the purposes of the Arboretum about 137 acres of the land in West Roxbury (now Jamaica Plain) devised to it by Benjamin Bussey for the purpose, as declared in his will, of establishing there as the Bussey Institution a course of instruction in practical agriculture and subservient and connected arts.

The Corporation in due course after 1872 and in the decades following established and maintained the Arnold Arboretum with its physical embodiment, as intended, on the Bussey land in Jamaica Plain, and with related activi-

ties centering in an administration building on the Arboretum grounds.

Charles Sprague Sargent was appointed Director of the Arnold Arboretum in 1873 and was elected Arnold Professor on June 30, 1879.  He held these positions until his death in 1927.  Oakes Ames and, after him, Elmer Drew Merrill followed Sargent as Arnold Professor, with the position vacant in 1927–1932, 1935–1936, and 1948–1954.  Each of these Arnold Professors held other responsible positions in the administration of Harvard's botanical collections.  Sargent in 1879 pointed out to the Corporation the need for both a library and a reference collection of plant specimens.  The Corporation promptly, and thereafter from time to time, made appropriations from the trust income for these purposes.  The library and herbarium were located in a dwelling house in Brookline until 1892 and thereafter, until the removal to Cambridge in 1954, in the administration building at Jamaica Plain.

Under the guidance of Professors Sargent, Ames, and Merrill, there had been accumulated by 1946 approximately 6,500 species in the living collection, 630,000 sheets of specimens in the herbarium, and 46,000 bound volumes and 14,000 pamphlets in the library.  By 1944, or earlier, the administration building had become overcrowded and presented a serious fire hazard.

The Arboretum under Sargent "had more or less followed a 'policy of isolation.' "  Professors Ames and Merrill, however, after 1927, departed from this policy by closer coöperation with other botanical departments.  At the same time the scientific work of the Arboretum was broadened to include pathology, cytology, genetics, ecology, and other fields.  As noted, the 1872 Indenture provided for the living collection to be raised at West Roxbury and the Arnold Professor to teach in the university and contained no other provision limiting the location of scientific work of the Arboretum.  Members of the staff conducted explorations in North America, Europe, Africa, Australia, and Asia to bring back living plants and specimens.  They used the

biological laboratories and Gray Herbarium in Cambridge for research and office space and taught courses in the Department of Biology at Cambridge. Research and experimental work were carried on at the Harvard Forest at Petersham and the Case Estates in Weston.[3]

The Arnold Arboretum, growing under able leadership, acquired many of the characteristics of an independent institution, and it came to be so regarded. It acquired high reputation and prestige. The Corporation received additional gifts and bequests as endowment funds for the purposes of the Arboretum. After 1927, the Corporation raised a fund of $1,000,000 as the Charles Sprague Sargent Memorial to add to the endowment.[4]

On January 19, 1953, after nine years of investigation, the Corporation adopted a statement of policy that included approval of the removal of the library and herbarium to Cambridge. This was pursuant to a plan to merge the library and herbarium with those of the Gray Herbarium. The statement declared that the Bailey Report of 1945, discussed below, should not apply to the Arboretum, and acknowledged that the property and endowment held for the purposes of the Arboretum were held by the Corporation in trust, and that "in the administration of the trust it is to act with a view to the best interests of the Arboretum." The statement of policy concluded with the determination by the Corporation, as trustee of endowment funds held for the purposes of the Arboretum, "that it is in the best interests of the Arboretum and will promote the purposes of its endowment to remove to a central building in Cambridge [the new Harvard University Herbarium] the main body of the library and herbarium of the Arboretum related to research, and to retain at Jamaica Plain such books and

---

[3] The "Case Estates" comprised land in Weston which was transferred to the Corporation in 1942–1945, to be "used for the benefit of Arnold Arboretum at Harvard University."

[4] The relators do not contend that the subsequent gifts were held for purposes other than those established by the Indenture of 1872. See Cary Library v. Bliss, 151 Mass. 364, 376–377; Trustees of Andover Seminary v. Visitors, 253 Mass. 256, 273.

specimens as may be required to provide there a working library and herbarium.'' The transferred books and specimens were to be identified as a part of the Arboretum and remain under the care of the Arnold Professor. The Arnold Professor and the directors of the university library and the New York Botanical Garden were to determine the books and specimens to be retained at Jamaica Plain. A part of the expense of annual maintenance and operation of the central building was to be charged to the Arboretum endowment.

Scientific, administrative, and legal consideration of the removal to Cambridge began in 1944. In that year, Professor Irving Bailey, a member of the staff of the Arboretum, was requested by the Provost of the university to investigate ''the total botanical situation'' of the university. Professor Bailey submitted his report in 1945. It contained no consideration of the responsibilities of the Corporation as trustee under the 1872 Indenture. Emphasized were the isolation and wasteful duplication of the various botanical activities at Harvard.[5] The proposed solution included the combination of all the botanical libraries and herbaria (as distinguished from the final action merging only those of the Arboretum and the Gray Herbarium and three other collections) in a central unit in Cambridge. Permeating the plan and its initial implementation was a concern for the overall needs of botany at Harvard.[6]

[5] Botanical institutions administered by the Corporation in 1944 and having libraries and herbaria were the Gray Herbarium, the Farlow Library and Herbarium, the Arnold Arboretum, the Botanical Museum, the Atkins Garden in Cuba, and the Harvard Forest.

[6] The master found that the Bailey report ''aimed in important part at increasing Harvard's prestige and at enabling Harvard to assume leadership in the botanical field. . . . [The report] strongly emphasized that the accomplishment of the Plan's objective was dependent on the recommended unification of the botanic libraries and herbaria, including those of the Arboretum and the Gray Herbarium. Bailey believed . . . that 'the future of Harvard's Botany' depended on unification. . . . In referring to the Arboretum, in a consideration of the possibility of an abandonment of the living collections, the Report characterizes the Arboretum as 'the goose that lays the golden eggs.' It recommended against abandonment for this and other reasons and it did recommend the restoration and improvement of the demonstrational aspects of the grounds and living collections since it found these of significance to the general public. The recommendations of the Bailey Report affecting the Arnold Arboretum were not made primarily to further . . . [its] interests . . . .''

From November, 1949, until January 19, 1953, strong opposition by the Board of Overseers' Committee to Visit the Arnold Arboretum, joined in by a member of the Corporation, directed the attention of those involved to the fact that a transfer of the library and herbarium must accord with the purposes of the Arboretum endowment.

In the course of the developing controversy those opposed to the move asked of the Corporation that the doubts be resolved by a legal proceeding. That the proposals were questioned by responsible persons dedicated to the welfare of the university and to the Arnold Arboretum strongly suggested, we think, the wisdom of following that course. With the benefit of hindsight it is now abundantly plain that the interests of all concerned would have been greatly served by so doing. The master found that the Corporation was determined not to seek a judicial determination of the issues involved because it believed its position legally sound, was hesitant to incur the very large expense involved and believed that some of the claims were on a moral level, which a legal decision would not dispose of.

On October 2, 1952, a resolution was drafted by counsel to the Corporation that, with certain changes, was to be approved by the Corporation as the resolution of January 19, 1953. A revised draft of October 14, 1952,[7] was approved by the Corporation in October. This draft resolution was, in substance, adopted by the Coordinating Committee on the Biological Sciences of the Board of Overseers and, on January 12, 1953, by the Overseers. The draft resolution was also submitted, in November, 1952, to representatives of the Visiting Committee, including counsel.

---

[7] Three recitals that were in the October 2 draft were omitted from the revision of October 14. These were "(1) that a purpose of the resolution was to continue the identity of the Arboretum; (2) that 'without limit of time' (the words 'for the present' being substituted) the income of the Arboretum would be first applied to the support of the living collections, the Arnold Professor, and the library and herbarium, and only then to other activities; and (3) that the Arboretum should bear no part of the maintenance of the central botanical building to which the bulk of its library and herbarium were to be moved."

Counsel to the Visiting Committee responded on December 22, 1952, urging that the Corporation as trustee was obliged to act "with a view solely to the best interests of the Arboretum" and that there be no removal since serious doubts had been raised as to whether removal would be in the Arboretum's best interests.

The master (under the heading of "The Motive Underlying the Adoption of the Resolution of January 19, 1953") found, inter alia, as follows:

(1) The resolution was adopted by the Corporation in the belief that action under it would not constitute a breach of trust and would be consistent with its conception of its obligations as to the property held for the purposes of the Arnold Arboretum.

(2) The decision to move the main body of the library and herbarium was made "wholly or in major part" because of a belief that although such removal was consistent with the Corporation's obligation with respect to the Arboretum assets "such removal would promote the science of botany as a whole at Harvard (rather than the interests of particular botanical institutions)."

(3) "The Corporation acted in the bona fide belief that it was entitled, and indeed had a duty, to consider the interests of botany as a whole at Harvard and the standing of the University in the botanical field."

(4) "The conviction of the Corporation, reflected in its [earlier] approval of the Bailey Plan, that a transfer of libraries and herbaria to a new central building in Cambridge would promote the science of botany at Harvard from an overall standpoint (rather than from the standpoint of each component part), having been made after careful and serious deliberation, remained the controlling factor in the Corporation's final determination to bring about the transfer of the main portion of the library and herbarium moved from Jamaica Plain."

(5) The Corporation accepted as sound the view underlying the language of the report of the Coordinating Committee of the Board of Overseers in 1950 that the Arbore-

tum should be regarded as an instrument in the development of botany as a whole.[8]

(6) The Corporation believed that "if it were required to act solely in the interests of the Arnold Arboretum with respect to the removal . . . it would be impossible to operate the University since the Corporation felt that it had to consider a great many different interests that were involved in the removal as well as the effect of the action on the University as a whole."

(7) The Corporation refused to state in the January 19, 1953, resolution that it was acting solely in the interests of the Arboretum because it was aware that it was not so acting.

The master found as to the effect of the removal of the main portions of the library and the herbarium to Cambridge, as follows:

(1) The high reputation, prestige, and standing, which the Arnold Arboretum had enjoyed separate from that of the university, markedly declined. The books, other library items, and the specimens "are commonly looked upon as those of Harvard rather than as those of the Arboretum, and thus the prestige of the Arnold Arboretum's library and herbarium has in effect been transferred to Harvard University, and the Arboretum has come to be looked upon as an appendage to the Botanic 'Department' at Harvard."

(2) Unsatisfactory housing and working conditions in

---

[8] The Coordinating Committee's report stated: "The Coordinating Committee believe that the present controversy is rooted in two opposed and apparently antagonistic schools of thought regarding the position of the Arboretum, and that of the other botanical research institutions, in the educational and administrative structure of the University. The Arboretum can either be regarded as an independent institution, a Corporate entity, of which the President and Fellows happen to be trustees, or as an integral department of the University, separately endowed, it is true, but a tool to be used in the development of botany as a whole and in the overall interests of the University. The Coordinating Committee believe the second to be the proper concept." The master found that the Coordinating Committee's report stated with respect to the proposed transfer of the library and herbarium that the sole criterion was whether it would further the advancement of botanical knowledge without impairing the usefulness and vigor of horticultural activity in Jamaica Plain and that, if the move strengthened botany as a whole within the university, it would inevitably react to the welfare of the Arboretum; also that the report stated that the Committee did not believe that the proposed transfer would be harmful to the Arboretum.

the administration building at Jamaica Plain have been remedied. The library and the herbarium are now well housed in a fireproof air conditioned building in Cambridge. All this could have been accomplished, however, without the removal to Cambridge.

(3) Segregation at Jamaica Plain of a library and herbarium devoted to horticulture "might have enabled more efficient work at Jamaica Plain in horticulture and in the use of the living collections," but this could have been accomplished without the removal of the bulk of the items to Cambridge. The evidence "does not warrant a conclusion that either the library or the herbarium at Jamaica Plain is reasonably adequate for horticultural or other work."

(4) The move has been of advantage to carrying on taxonomic research in Cambridge because of "the vast number of the books, pamphlets, periodicals and specimens of the Gray and Arnold . . . combined together in one building with other botanical facilities and scholarly contacts at hand or nearby." There is, however, a "marked disadvantage" to the carrying on of such research "arising from the separation of books and herbarium specimens from the living collections in Jamaica Plain, from the separation of the wild and cultivated specimen collections and from the division of the Arboretum staff resulting from the move."

(5) The work performed by persons paid from Arboretum funds in taxonomy, horticulture and other scientific fields has continued. They are performing competent scientific work. There is no evidence of either improvement or decline in the quality of work.

(6) The services of the Arnold Professor have not been shown to have been diverted from the care and management of the Arboretum.

(7) The books and specimens of the Arboretum now in the Harvard University Herbarium are under the control of the Arnold professor. Use is made of them, as before, but to a greater extent, by Harvard students and faculty and others engaged in research. Each separate library item is identified as an Arnold Arboretum item, but not

in the card catalogue. A book housed at Cambridge if lost or misplaced cannot be identified from the catalogue as having been an Arboretum book. Each herbarium sheet from the Arboretum is so marked but the herbarium cases are not marked and one must examine each sheet to determine ownership.

(8) Since the removal, persons paid with Arboretum funds have performed the same type of activities as such persons performed earlier. These activities have been carried on in Jamaica Plain, Cambridge and Weston. The evidence does not establish either improvement or impairment in such work.

(9) "The removal of the main part of the library and herbarium of the Arnold Arboretum and the coupling of it with the Gray Herbarium and its library at the Harvard University Herbarium created one of the greatest libraries and herbaria in the world and a world famous scientific station identified with Harvard. Notwithstanding the effect of the removal on the Arnold Arboretum, the removal was in the interests of botany as a whole both in intent and effect, and the return of the Arboretum portion of the library and herbarium to Jamaica Plain would be a retrograde step from the standpoint of botany. A witness called by the petitioner testified that he considered such a step would create 'a tremendous outcry from botanists throughout the country' and would be unthinkable."

The view that there has been a breach of trust is, we think, founded in the concept of an obligation to maintain the Arnold Arboretum as the particular institution that the combined efforts of the Corporation, professors, directors and staff in the use and application of the trust funds over the years had caused it to become.[9] For reasons stated in

---

[9] This view was manifest in the 1950 opinion of Mr. J. Wells Farley to the Visiting Committee of the Overseers: "[T]he Arboretum had the status in its own right of an institution" (defined, in the opinion, as an organization of people who have become affiliated for a common purpose and whose assets are used and expended for that purpose by its officers or agents and whose affairs are subject to the control of a unified management), even though not a corporate entity. The Farley opinion found nothing in recent events which would make it impossible to continue to carry out the purposes of the Arbore-

the following paragraphs we hold that such an obligation was not imposed by the 1872 Indenture.

The express intent of the 1872 Indenture is to benefit the public through the establishment and maintenance by Harvard University of an arboretum as described, and a professorship in the university as described. Certain other purposes are implicit. Obvious are the creation and maintenance of related libraries and herbaria and the conduct of directly related activities. This being a public charitable trust there are, we hold, other important implications to be found therein.

There is a dominant public interest that public charitable trusts in private educational hands be so managed under the particular trust provisions as to be of maximum usefulness, thus serving to the greatest possible extent the public as the ultimate beneficiary. In the light of this, in a gift to a university of trust funds to create a specific subdivision of scientific or cultural activity of the university (that is, broadly, a department[10]), there is, we think, an implied intention that the managers of the university shall determine in their best judgment what policies, in respect of that department, within the express trust purposes, will give that department and the trust assets used therein their greatest

---

tum as it had been conducted from 1872 to 1946 and pointed to the principle applicable in the case of charitable trusts that neither considerations of convenience nor differences of opinion as to the desirability of policies established by the creator or donor of the trust may properly override the terms of the instrument creating the trust. The opinion noted that the Indenture of 1872 did not in terms prohibit a transfer of the library and the herbarium from Jamaica Plain, but said that these and the other steps of the Bailey report (to which it was addressed) stood out ''as steps toward the abolition of the Arboretum as such and therefore constitute a breach of the duty of the trustees to maintain it as an institution.'' The view that the Arboretum must be dealt with as a separate institution also underlay the opinion of Mr. Robert G. Dodge and Mr. Farley, dated March 1, 1952. That opinion referred to the Arboretum as ''the beneficiary'' and stated in a footnote: ''In referring to the Arboretum as the beneficiary we do not overlook the fact that, strictly speaking, the Arboretum is the object of the trust and that the ultimate beneficiaries are the public, or those of the public who are in a position to benefit from or make use of or enjoy the Arboretum.''

[10] The Corporation's trust obligations are not changed by a reference to the Arboretum as a department. We use the term as descriptive of one of the many scientific and cultural activities managed by the Corporation but separate from other such activities to the extent that the Indenture, with its reasonable implications, indicates.

usefulness. Certainly it is implied that to such end the managers may decide to correlate the activities of the department with the overall policies of related departments, provided all applicable restrictions are regarded, and the trust assets are used advantageously for the specific purposes of the trust.

These implications exist in respect of the trust under the 1872 Indenture. The advantages of having the Arboretum a part of the larger scientific and professional operation of Harvard University were, it appears, recognized by at least one of the donor trustees. See *Harvard College* v. *Attorney Gen.* 228 Mass. 396, 410. These implications are not negatived by the express requirement of the 1872 Indenture that the fund "not be diminished by supplementing any other object." The use of the fund and its income for the purposes of the Indenture is not diminished in any degree. The Indenture, in expressly providing that the Arboretum as there described have its physical embodiment in West Roxbury (Jamaica Plain), specified a physical separation from other parts of the university in Cambridge. As described in the Indenture the Arboretum was a place for the growing of "trees, shrubs, and herbaceous plants." The separation of this activity from Cambridge does not imply a requirement that the Arboretum be managed as though it were unrelated to an institution having other divisions with similar activities.

We agree with the relators that the Indenture did not give a fund to the Corporation to be used for general botanical purposes. Nevertheless, the Corporation, in the course of determining what management of the assets of the Arboretum would reasonably and appropriately serve the direct purposes of the Indenture, was entitled to give consideration to the effect of the move on other departments and botany as a whole at Harvard and the possible general advantages to result. Such consideration cannot mean, however, that those other ends are to be regarded as purposes of the Indenture. Even in administering a private trust, the trustee may regard related matters. *Penniman* v. *San-*

*derson,* 13 Allen, 193, 205–206. The duty to consider the overall welfare of the university and the ultimate purposes of all its foundations of course did not disqualify the members of the Corporation in respect of the decision under the Indenture. Resolution of possibly divergent interests is inherent in the holding and management by a single institution of a number of public trusts for independent, related or overlapping purposes.

The members of the Corporation did not violate the "duty of loyalty" that required them to "administer the trust solely with a view to the accomplishment of the purposes of the trust and not with a view to promoting their own interests." Scott, Trusts (2d ed.) § 379, p. 2735. *Boston Safe Deposit & Trust Co.* v. *Lewis,* 317 Mass. 137, 140. They did not act adversely to the trust and, in taking into consideration the effect on botany as a whole, they were regardful of an end which, as we have held, was within the general implied purposes of the public trust so far as in support of the specific purposes. The members of the Corporation rightly declined to accept the view that they were required "to act solely in the interests of the Arnold arboretum." The implication of a determination to this effect would have been to exclude relevant and appropriate considerations.

The plain obligation of the members of the Corporation was to bring to bear the attention and judgment required of trustees in the performance of their trust duties on the issue of the effect of the move on the continued accomplishment of the express purposes of the trust and to act in a way that they believed in their good judgment would promote those purposes. We hold that the findings show that they did so act.

The subsidiary facts support the master's conclusions that the challenged move stemmed from the Bailey report and that the promotion of the science of botany at Harvard from an overall standpoint was the controlling factor. This conclusion, however, does not in itself imply a finding that the members of the Corporation failed to give consid-

eration to the effect of the move on the accomplishment of the trust purposes, or failed adequately to weigh evidence relevant thereto.

The members of the Corporation acted in the light of an opinion from their counsel. This advised that the transfer might lawfully be carried out "provided, (i) that the removal be justified as promoting the purposes of the Arboretum, (ii) that such books and specimens 'as are required to provide a working library and herbarium at Jamaica Plain should be retained there' and (iii) that any additional annual operating costs chargeable to the Arboretum be justified upon a determination by the Corporation of the extent to which the Arboretum purposes would be benefited by the move, having regard to all other proper demands on the income of its endowment." It advised as to administrative and research activities and other matters as to which there is no present issue. It also advised that the proposed removal was justified if the conditions stated in the opinion were met. It concluded with the observation that "there is persuasive evidence that the move will promote the purposes of the Arboretum."

The Corporation acted in the light also of a memorandum from President Conant of October 15, 1952, in which he argued at length in favor of the removal of the main part of the library and herbarium to Cambridge. He gave various reasons in support of the position "that the work of the Arnold Arboretum may be carried on more effectively" if the move were made. He pointed out also that the removal would "assist all those concerned with a knowledge of botany." Stress was laid on the aid to teaching the knowledge of trees in the university which would result from the presence of the library and herbarium in Cambridge. He characterized the Arnold Professor as a "part of the University." This memorandum reflected his final decision as to the removal.

At a meeting of the Corporation on January 5, 1953, there was read a letter from Mr. Grenville Clark, one of the relators, and a former member of the Corporation, who had

resigned in November, 1950, with enclosed memoranda prepared by Professor Lawrence, the head of the Hunt Botanical Library in Pittsburgh and director of the Bailey Hortorium, a botanical institution operated by Cornell University, and by Professor Slate, a professor at Cornell. The Corporation thereupon decided that, "at least as a matter of record," certain other outside scientists should be consulted. On January 17, 1953, a committee of President Conant and Messrs. Marbury and Kane conferred in New York with Mr. J. George Harrar, Director of Agriculture for the Rockefeller Foundation in Mexico, Professor Paul B. Sears, Professor of Conservation in charge of the Agricultural Conservation Department of Yale University, and Dr. David B. Keck, Head Curator of the New York Botanical Gardens. Each was consulted individually. President Conant showed them the resolution of the Board of Overseers of January 12, 1953, and read them the provisions of the 1872 Indenture. The three persons consulted replied affirmatively to the inquiry whether the move would be "the best way of carrying out the terms of the trust." Each agreed that the work of the Arnold Professor would be assisted by the move and that the Arnold Professor and his staff could work efficiently, partly in Cambridge and partly in Jamaica Plain. "Dr. Keck, at least, was asked whether, in his opinion . . . the move would be desirable from the standpoint of botany at Harvard University." He replied that in his opinion it would. Asked as to the effect on the Arboretum, he pointed out "what he considered to be the disadvantages of the move from the Arboretum's standpoint."

The master noted that the basis for choosing the consultants or who chose them does not appear and that the qualifications of Messrs. Harrar and Sears are not shown and expressed the view that "their titles as of the time of consultation give no basis for placing confidence in their judgment on the matters presented to them for opinion."

There is no suggestion in the findings that President Conant's opinion that the move would permit the work of the Arboretum to be carried on more effectively did not re-

flect his best judgment on adequate evidence or that it was untenable for one giving due regard to the nature of that work as required under the Indenture. We put aside for the moment the issue of the possible effect on prestige and reputation. Certain of the findings suggest that the reference to outside experts was perfunctory. We think it was adequate for its purpose. The aim of the members of the Corporation was, it appears, to let the record show that, accepting their premises, there was professional support outside the university for the decision. Contrary to the master's comment, we think that there is implicit in the titles of the consultants a suggestion of a background of experience and professional standing that would give a degree of substance to their opinion.

We do not overlook the master's findings that the decision to move was made because of a belief that it would "promote the science of botany as a whole at Harvard (rather than the interests of particular botanical institutions)." We do not construe this as a finding that the Corporation disregarded the carrying out of the express purposes of the 1872 Indenture. It is coupled with the finding that the Corporation believed the removal to be consistent with the Corporation's obligations with respect to the Arboretum assets. It does not negative the declared views of the President and the Corporation that the move to benefit botany as a whole at Harvard would be "in the . . . best interests of the Arboretum and . . . promote the purposes of its endowment." The finding that the Corporation accepted the view of the Coordinating Committee that the Arboretum should be regarded as an instrument in the development of botany as a whole must be read with other findings that, in our view, show that the Corporation did not undertake to use the Arboretum as such an instrument except after finding, on an appropriate showing, that the course to be followed would advance the particular purposes of the Arnold trust. To the extent, if any, that the master's report may be thought to suggest otherwise we draw different conclusions from the specific findings.

Implicit in the master's findings is the conclusion that if the Corporation had accepted "the best interests of the Arboretum" as an important criterion, its members, acting with due care and in good faith, must have decided against the move. A decline in the reputation, prestige, and standing of the Arnold Arboretum as a separate institution was, we think, reasonably foreseeable. But the purpose of the 1872 Indenture was not the maintenance of the prestige, reputation, and standing of the institution or department that might evolve over the years in connection with the use of the trust funds by the Corporation to build the Arboretum. Nor were these intangible attributes solely the fruits of the trust fund. They resulted in part from the association of the Arboretum in the group of related Harvard institutions and departments, the interplay between these departments, and the management of the Arboretum by the managers of the university. Whether the Corporation could rightly risk impairment of the prestige of the Arboretum regarded as a separate institution depended upon whether the steps taken, in reasonable likelihood, would impede or promote the stated purposes of the public trust, the funds of which had been used in the creation of that prestige.

There was ground for concluding that the net result would be to promote those purposes. The Arboretum would continue as a part of a group of botanical science departments that was expected to attain outstanding preëminence. The outcome that the master has found was foreseeable: the creation of "a world famous scientific station" with "one of the greatest libraries and herbaria in the world." The members of the Corporation could reasonably conclude that in the long run the accomplishment of all the specific scientific and teaching purposes of the Indenture of 1872 would be aided by the move and that outstanding scientists, scholars and students would be at least as much attracted to association with the Arboretum as before, and, in reasonable likelihood, more so, and that their work on the whole would benefit.

Therefore, so far as transferring the prestige from the Arboretum to the university was a use of an asset of the Arnold trust fund, that transfer was, prospectively, a use of the asset for the accomplishment of specific public charitable purposes of the Indenture that established that fund and not a breach of trust. The prestige was not, in our view, a capital asset, which, once accrued, could not be expended.

To act in "the best interests of the Arboretum" means, in our view, to serve advantageously the stated purposes of the trust and not necessarily to maintain the separate reputation of the Arboretum. "[T]he trustee of a charitable trust owes duties but . . . not . . . to any person or persons in particular, although they are enforceable at the suit of a public officer for the benefit of the community." Scott, Trusts (2d ed.) § 348, p. 2552. See also § 379, p. 2735.

The prospective adverse effect of the move on the reputation, standing, and prestige of the Arboretum was, of course, highly important apart from its legal aspect. Such an institution, although a subdivision of university activity, develops a separate personality and generates the loyalty and support of teachers, staff, alumni, donors, and friends. These, we think, are the considerations that the members of the Corporation had in mind in concluding, as the master found they did, that moral issues were involved that could not be settled by a legal adjudication. These considerations — the effect of the move on the loyalty and interest of many persons close to the university and devoted to it and the Arboretum, as well as a due regard for their views — although properly of most serious concern to the Corporation, cannot affect our rulings. It is appropriate for us say, however, that the report, as we view it, shows that the members of the Corporation did not overlook them, but found them overbalanced by the other factors necessarily weighed by them. The report does not show or suggest that the Corporation was acting to increase the prestige of Harvard University as an end in itself.

The findings of the effects of the move do not show that inadequate consideration was given to probable results or

that bad judgment was exercised. There is an implication that the "marked disadvantage" in carrying on taxonomic research in Cambridge more than offsets the advantages therefrom. But the master was unable to find either improvement or decline in the continuing work of the Arboretum and it is of course too soon to judge the long run effects. Nothing in the report shows that those effects will not be of net benefit in the accomplishment of the specific trust purposes of the 1872 Indenture.

What we have said disposes of the contention that the move itself, so far as carried out as voted, was a breach of trust.[11] We disagree with the view of our dissenting colleagues that it is implicit in the Indenture that the place of such implied related activities as the library and herbarium, if established, be the place specified for the growing of the trees, shrubs and plants. The dominant consideration is that those things and only those things be done that will, in the good judgment of the Corporation, promote the express purposes of the Indenture. There is no implication that, to promote those purposes, the library and herbarium could not be maintained at Cambridge. This is tested, we suggest, by considering whether, if these facilities had been originally established and always heretofore maintained in Cambridge, it could now be contended that there had been a breach of trust.[12] In certain aspects, however, the implementation of the resolution of January 19, 1953, does not, or may not, conform to its terms.

The master's report states "the evidence does not warrant a conclusion that either the library or the herbarium at Jamaica Plain is reasonably adequate for horticultural or other work." The resolution calls for the retention at Jamaica Plain of "such books and specimens as may be required to provide there a working library and herba-

---

[11] It is unnecessary to deal separately with the contention of the relators that the allocation of Arnold trust money to the support of the Harvard University Herbarium was improper. This stems from the view that the move involved a breach of trust. The master has found that the bases of the allocation of the charges were reasonable.

[12] The construction we make would not, we think, as our colleagues suggest, have supported moving the Arboretum's library and herbarium to Harvard's Atkins Garden in Cuba.

rium.'' The implication from the master's observation and from the finding that the working library and herbarium were gathered by selecting duplicates of items taken to Cambridge may be that the intention of the Corporation's vote has not been met.

The resolution required that the books and specimens to be housed at Cambridge be appropriately identified. We hold that this includes identification of the books on the card catalogue and of the specimens on a catalogue, if any, or on some other form of general listing, if feasible. Also we think that appropriate identification calls for a sign or legend of substantial size on the outside of, or in the foyer or a general room of, the Harvard University Herbarium stating in some form of words that the books and specimens include those of the Arnold Arboretum.

The interlocutory decrees are affirmed.

The rescript shall provide that the county court retain jurisdiction of the cause and that the defendant shall file with the clerk within six months of rescript (a) a report to it by the Arnold Professor or other appropriate person that in the Corporation's judgment shows either that an adequate working library and herbarium exist at Jamaica Plain or recommends the steps to cause them to exist; (b) a report of its proposals or action to amplify the catalogue and general listing references; and (c) a report of its proposal or action in respect of a general designation on or within the Harvard University Herbarium.

A final decree affirming the validity of the Corporation's votes and acts as modified by the foregoing changes shall enter when it shall appear to the single justice that such changes, adequate to conform to this opinion, have been made or are assured.

*So ordered.*

The Chief Justice and Mr. Justice Reardon took no part in the consideration of this case. The Chief Justice was a member of the Harvard Board of Overseers from 1957 to 1963, and Mr. Justice Reardon became a member in 1961 and is still serving.

SPIEGEL, J. (dissenting) Mr. Justice Kirk and I agree with the majority that the "plain obligation of the members of the Corporation" was to use the trust assets "for the express purposes of the trust," but we do not agree that "the findings show that they did so act." Although the Corporation may have "believed the removal to be consistent with the Corporation's obligations," belief does not constitute compliance. The Corporation did not use the trust assets "within the express trust purposes." It palpably misinterpreted those purposes. The majority, it seems to us, have chosen to accept the Corporation's mistaken conception that the purpose of the trust is the establishment and support of an instrument "to be used in the development of Botany as a whole and in the over-all interests of the University."

The majority admit that the "express intent" of the Indenture is "to benefit the public through the establishment and maintenance by Harvard University of an arboretum as described, and a professorship in the university," but the majority say that "[c]ertain other purposes are implicit." One such purpose, they say, was "to create a specific subdivision of scientific or cultural activity of the university (that is, broadly, a department)." It is this holding, which apparently serves as a major premise upon which the reasoning of the opinion is based, that results, in our view, in an erroneous conclusion.

In writing this dissent we are constantly confronted with the "implications" which the majority create. The unadorned language of the "express trust" is brushed aside and the opinion rests on a fragile foundation of "implications."

We agree with the majority that "the Corporation's trust obligations are not changed by a reference to the Arboretum as a department." The employment of this concept in administering the trust does not *change* the obligation; it *violates* it. The Indenture provides for the support of an Arboretum. It does not provide for the Arboretum to be one of the "parts" of the university or a

"department" of the university or a "subdivision of scientific or cultural activity of the university."

If the purpose of the Indenture was to make the Arboretum just another of the many departments of Harvard, the Arboretum's library and herbarium could have been removed, for example, to the Harvard administered Atkins Garden in Cuba solely on the basis of a trustee's decision that such a move would give "that department and the trust assets used therein their greatest usefulness."

The majority state that the term "department" is merely "descriptive" of an activity "managed by the Corporation." A department is defined in Webster's Second New International Dictionary in the context of education as "[a] division *within* a college or school, giving instruction in a branch of the arts and sciences" (emphasis supplied). This may be descriptive of the Arboretum after the move, but it is not descriptive of the Arboretum envisioned by the Indenture.

In our judgment the Arboretum is not, as the majority say, a "subdivision of scientific or cultural activity of the university (that is, broadly, a department)." It is, as the footnote to the majority opinion states, "*a place* where trees, shrubs, and herbaceous plants are cultivated for scientific and educational purposes" (emphasis supplied). Under the terms of the Indenture, the "place" is in West Roxbury (now Jamaica Plain). A fund for "the establishment and support of an Arboretum" may be expended to enable persons to make proper use of the "place," such as by creating and maintaining related libraries and herbaria; but not for anything which does not advance the operations of that "place." It should be noted that when the Indenture was made the university was engaged in similar work at the Bussey Institution and the Botanic Gardens. That the donor intended the Arboretum to have a separate and independent identity is shown by the specific provision that the funds "shall not be diminished by supplementing any other object, however meritorius, or kindred in its nature." Plants might be taken for the use

of the college only if they could be spared without injury to the Arboretum. These provisions indicate to us that the intent of the donor was not to create a peripheral "appendage" to the botany department at Harvard but to create as a distinct entity a "place" for the cultivation and study of plants and shrubs.

In 1879 (seven years after the Indenture), the year in which the Arboretum was established, the first Arnold Professor stated that "without a herbarium of specimens . . . and without a library . . . it would be impossible either to carry on the current operations of the Arboretum or to make it what, in his judgment, it should be, a center of dendrological investigation and research." In 1924 he wrote "such an institution [as the Arboretum] must consist of three departments: First, the herbarium; second, the library; third, the collection of living trees and shrubs. . . . The value of this [latter] department is dependent on the first department or collection of dried plants, and this is dependent on the second department, the collection of books."

The majority state that "[t]here is no implication that, to promote those purposes [the express purposes of the Indenture], the library and herbarium could not be maintained at Cambridge." The express purposes of the trust require the trustee to find that the removal of the library and herbarium from the Arboretum to Cambridge would be in "support" of the Arboretum and not of the university. This the trustees did not do.

The majority argue that "[t]he separation of this activity [the growing of trees, shrubs and herbaceous plants] does not imply a requirement that the Arboretum be managed as though it were unrelated to an institution having other divisions with similar activities." "There is a vast distinction between a related activity and a subordinate one. We find no implication in the Indenture that the Arboretum was to become a division and, therefore, a subordinate part of the university.

The purposes of the trust limit the power of the trustee. "The extent of the duties and powers of a trustee is deter-

mined . . . by the terms of the trust as the court may interpret them, and not as they may be interpreted by the trustee himself or by his attorney. . . . [The trustee] can, however, escape liability by submitting the matter to the court for instructions." Scott, Trusts (2d ed.) § 201, p. 1510.

We note with special interest that "a legal opinion entitled 'Report on the Questions Raised by the Bailey Plan,' prepared, at the request of the Visiting Committee, by Robert G. Dodge, Esquire, and the law firm of Herrick, Smith, Donald, Farley & Ketchum, of which J. Wells Farley, Esquire, was a member, was submitted to the Visiting Committee." This report contained the following conclusions: " . . . that carrying out the Bailey Plan would involve the Corporation in various breaches of trust arising from its administrative proposals and its alleged diversion of Arboretum income to purposes foreign to the purposes of the Arboretum trust, and that its effect would be to destroy the Arboretum as a separate identifiable institution; . . . that the proposed removal of the greater part of the library and herbarium to Cambridge was not in the interests of the Arboretum . . . and that, whether or not the Corporation and its counsel agreed with the Farley-Dodge conclusions, the Corporation should seek a judicial determination of the matter."

Thus it is certain, that at least after the receipt of the Farley-Dodge report, the Corporation knew that serious legal questions were raised concerning the purposes of the trust, and also knew that it could seek a judicial determination of the issues in controversy. Yet it chose not to follow such a course. On the other hand, the opponents of the Corporation's plan wanted to get a judicial decision through the only channel of approach to the court, without avail. *Ames* v. *Attorney Gen.* 332 Mass. 246.

The failure to ask for a judicial determination when one was patently called for makes inapplicable to the Corporation's decision the principle of *Trustees of Andover Seminary* v. *Visitors*, 253 Mass. 256, 298, that " [t]he practical

construction put upon a charitable foundation of doubtful meaning by those charged with its administration through many years is entitled to great weight in ascertaining its right construction." Instead, this principle directs our attention to the status of the Arboretum prior to the controversy.[1] As the majority admit, and as the master found, "[t]he Arnold Arboretum, growing under able leadership, acquired many of the characteristics of an independent institution, and it came to be so regarded." The master found "The Arboretum prior to the removal of the main portion of its library and herbarium to Cambridge had a reputation of its own as a botanical institution and this reputation was separate and distinct from the reputation of Harvard University or of the other botanical enterprises administered by Harvard."

The majority, at one point, admit that "the Indenture did not give a fund to the Corporation to be used for general botanical purposes." However, the majority appear to modify this holding by adding that "the Corporation, in the course of determining what management of the assets of the Arboretum would reasonably and appropriately serve the direct purposes of the Indenture, was entitled to give consideration to the effect of the move on other departments and botany as a whole at Harvard and the possible general advantages to result. Such consideration cannot mean, however, that those other ends are to be regarded as purposes of the Indenture." If the majority statement means that after having determined that any of several different actions would serve the direct purposes of the Indenture the trustee may then consider related matters in selecting the action to be taken, we would agree. But if this statement means that in the making of that determination the trustee may consider matters other than the direct purposes of the trust, we would disagree. Such a holding we believe to be a violation of the basic principle

---

[1] We cannot fail to observe that in 1892 the library and herbarium were removed from temporary housing in Brookline to Jamaica Plain. The library and herbarium remained there for over sixty years.

of the law of trusts, that the trustee must administer the trust "solely with a view to the accomplishment of the purposes of the trust." Scott, Trusts (2d ed.) § 379, p. 2735. In addition, such a holding would permit "general advantages" or great benefit to "other departments" or to "botany as a whole at Harvard" to override even great harm to the Arboretum. On such a theory the fund could be used not merely for general botanical purposes, but for any purpose whatever which would benefit the university. We know of nothing in the law of trusts to justify such a gross departure from the terms of the Indenture. The Corporation, however, seems to have taken precisely this view. The master found "The Corporation acted in the bona fide belief that it was entitled, in determining whether to cause removal, to give controlling weight to" the promotion of "the science of botany at Harvard from an overall standpoint." Another indication of the basic misunderstanding by the Corporation of its responsibility is found in the statement of the Chairman of the Coordinating Committee on the Biological Sciences "that the real beneficiary was the public which would benefit from education, and that the trustee has an obligation to use the funds for those purposes which it deems will best promote educational ends and as much of a duty to use them for those purposes as to use them for the benefit of the Arboretum and like any trustee must exercise its best judgment as to the balance between the two purposes." We do not accept this subordination of the basic purpose of the trust.

Ordinarily, we would agree with the statement in the opinion that "[T]he duty to consider the overall welfare of the university and the ultimate purposes of all its foundations . . . did not disqualify the members of the Corporation in respect of the decision of the Indenture." We say, "ordinarily," because we would expect the Corporation to correctly determine the purpose of the Indenture and if there was doubt as to its purpose we would expect the Corporation to have that doubt resolved by judicial decree. But, in the instant case we are considerably con-

cerned about a possible conflict of interest. This has nothing to do with the issue of good faith. The difficulty here is that the Corporation, mistakenly we believe, ''accepted as sound the view . . . that the Arboretum should be regarded as an instrument . . . 'to be used in the development of Botany as a whole and *in the over-all interests of the University*' '' (emphasis supplied).

The holding of the majority that the Corporation acted properly because it believed its action would advance the purposes of the trust rests on the unsupported assumption that the Corporation properly understood the purposes of the trust. The *belief* of the Corporation is not proof that it correctly interpreted the *purpose* of the Indenture. This is true even though that belief was sustained by the legal opinion of its counsel. Because President Conant gave ''various reasons in support of the position 'that the work of the Arnold Arboretum may be carried on more effectively' if the move'' to Cambridge were made does not vindicate the position of the Corporation if it misinterpreted the purpose of the Indenture.

Further, the Corporation can receive no support from the opinion of outside scientists consulted ''at least as a matter of record'' *after* the Corporation had decided to transfer the library and herbarium to Cambridge. They were asked whether the move would be ''the best way of carrying out the terms of the trust.'' Their affirmative answer to this query is of no significance in interpreting the purposes of the Indenture. It is obvious that this required legal knowledge. We observe, too, that the master found that ''[t]hey were not asked whether the move would be in the best interests of the Arnold Arboretum.'' We note with interest that one of these scientists, when asked as to the effect on the Arboretum, ''pointed out . . . what he considered to be the disadvantages of the move from the Arboretum's standpoint.''

In fact, the Corporation did not accept the view that ''the general and ultimate purpose'' of the Indenture was, as expressly stated therein, for ''support of an Arboretum.''

Instead "[t]he Corporation . . . accepted as sound the view . . . that the Arboretum should be regarded as an instrument . . . 'to be used in the development of Botany as a whole and in the over-all interests of the University.'"

It is precisely because "[t]he master's report is well organized, clear, and complete," as the opinion states, that we are able to show that the Corporation failed to properly consider the purpose of the trust. As the majority state, "[i]mplicit in the master's findings is the conclusion that if the Corporation had accepted 'the best interests of the Arboretum' as an important criterion, its members . . . must have decided against the move."

The master found that "At the time of the move . . . the Arboretum library contained about 48,600 bound volumes and 15,400 pamphlets, of which all except approximately 7,000 volumes, including pamphlets, were moved." In addition, "[a]ll but about 4% of the wild specimens were removed from Jamaica Plain to Cambridge, and except for wild specimens in two categories, that is, wild herbaceous weed specimens and wild crataegus specimens, only about 1% of the wild herbarium specimens of the Arboretum were retained in Jamaica Plain."

The master also found that "[t]he decision to move the bulk of the Library and herbaria was not made for the benefit of teaching in the University by or under the direction of the Arnold Professor." Further, "[t]he relief of whatever unsatisfactory housing conditions existed in the Administration Building at Jamaica Plain was not a controlling or significant factor influencing the determination to move the bulk of the library and herbarium to Cambridge." Instead, "[t]he Corporation acted in the bona fide belief that it was entitled, in determining whether to cause removal, to give controlling weight to . . . [the] consideration" of the promotion of " the science of botany at Harvard from an overall standpoint."

The majority conclude that the purposes of the trust could be advanced by the transfer because "[t]he Arboretum would continue as a part of a group of botanical sci-

ence departments that was expected to attain outstanding preëminence. . . . [O]utstanding scientists, scholars and students would be at least as much attracted to association with the Arboretum as before, and, in reasonable likelihood, more so, and that their work on the whole would benefit.''

This conclusion contrasts sharply with the master's findings that as a result of the move not only have ''[t]he reputation and prestige of the Arnold Arboretum . . . been materially injured,'' but also ''the Arboretum library and herbarium at Jamaica Plain were materially impaired for taxonomic, horticultural and other scientific work.'' It is also in marked contrast with the finding of the master that, despite the advantages to the carrying on of taxonomic research in Cambridge from consolidation of the libraries, ''there is . . . a marked disadvantage to the carrying on of such research arising from the separation of books and herbarium specimens from the living collections in Jamaica Plain, from the separation of the wild and cultivated specimen collections and from the division of the Arboretum staff resulting from the move.''

When the Corporation between June 7, 1954, and July 9, 1954, moved about six-sevenths of the Arboretum's books and herbarium specimens to Cambridge this could hardly be in the best interests of the Arboretum as a *''place''* associated with Harvard. This move undoubtedly would result in an increasing number of scholars being attracted to Harvard due to the preëminence of its entire botanical complex. The converse, however, is true of the Arboretum. Its position in the botanical world has been denigrated and it has become a mere adjunct of Harvard. As the majority state, ''A decline in the reputation, prestige, and standing of the Arnold Arboretum as a separate institution was, we think, reasonably foreseeable.'' Another outcome, however, of the Corporation's decision, according to the majority of the court, was also foreseeable: ''[T]he creation of 'a world famous scientific station' with 'one of the greatest libraries and herbaria in the world.' ''

The majority say that "[t]he prestige was not, in our view, a capital asset, which, once accrued, could not be expended." Perhaps that is so. We maintain, however, that it could not be expended to the detriment of the Arboretum. While prestige is an intangible asset it can hardly be disputed that its value to an educational and scientific institution is inestimable. Harvard itself is a classic example. The prestige achieved by the Arboretum arose out of the application of the trust funds. Whether "prestige" is a "capital asset" or not it had a *real value* in every sense. To transfer that value to the university, without any quid pro quo, cannot be justified.

Regardless of how altruistic the Corporation's motives may have been, the unalterable fact is that the Arboretum has served as a "tool"[2] for the promotion of "the science of botany at Harvard from an overall standpoint," rather than a separate, distinct and identifiable entity, associated with Harvard and not a department thereof.

As we bring this dissent to a close we are mindful that the Corporation's opposition to seeking a judicial decision rested not only on its belief that its position was legally sound, but also because it was "conscious of the fact that there were claims on a believed moral level which a legal decision would not dispose of." We have presented our views on the legal issues. The moral issues remain. They must be left for the ethical judgment of others.

We think there was a breach of trust. "[N]o length of time of diversion from the plain provisions of a charitable foundation will prevent its restoration to its true purpose." *Trustees of Andover Seminary* v. *Visitors,* 253 Mass. 256, 298. Accordingly, we would order the Corporation to return to the Arboretum at Jamaica Plain those books and specimens which are not duplicated there and to refrain from using the trust funds for the maintenance of the Harvard University Herbarium in Cambridge.

---

[2] See footnote 8 of the majority opinion.