Petition of the UNITED STATES ON BEHALF AND FOR the BENEFIT OF the SMITHSONIAN INSTITUTION, Trustee.

Harbor Branch Foundation, Inc., Intervenor.

Civ. A. No. 77-0320.

United States District Court, District of Columbia.

Jan. 31, 1980.

---

Patricia N. Blair, James G. Bruen, Jr., Civil Division, Dept. of Justice, Washington, D. C., on behalf of petitioner.

James V. Dolan, Kenneth I. Jonson, John R. Labovitz, Kenneth D. Ludwig, Steptoe & Johnson, Washington, D. C., on behalf of intervenor and amicus curiae.

MEMORANDUM OPINION

BARRINGTON D. PARKER, District Judge:

### Introduction

In this proceeding brought by the United States [1] the Court is called upon to construe the terms and conditions of two separate charitable gifts made to the Smithsonian Institution in 1969 and to instruct the Smithsonian as to its duties and obligations as trustee. The gifts were substantial and were among the largest ever made to the Institution. Their present combined value is in the neighborhood of $15 million.

While the donors were different, Mr. J. Seward Johnson of the Johnson & Johnson pharmaceutical family was a moving force in each. The gifts were related to oceanography, an area in which Mr. Johnson had long maintained an interest.

The first, known as the Johnson gift, was made in October, 1969, by Seward Johnson. It consisted of Johnson & Johnson stock whose value at the time was approximately $2 million.

The second, known as the Hunterdon gift, was made two months later by the trustees of the Hunterdon Medical Center School of Health in Flemington, New Jersey. The School was established in 1965 by Mr. Johnson to provide education in preventive medicine, early diagnosis and nutrition. His contributions provided its entire support. The School did not develop as planned, however, and in the fall of 1969, the trustees decided to dissolve it. They in turn made a gift to the Smithsonian of one-half of the School's assets valued at about $3.6 million.

The petition of the United States names as interested persons the Attorney General of the United States as "*parens patriae* of the public beneficiaries of this charitable trust," J. Seward Johnson in his individual capacity and as president of the Harbor Branch Foundation, Inc., and Mr. Edwin A. Link. Harbor Branch Foundation, Inc.,[2] a private operating foundation under the tax laws, is an organization through which Mr. Johnson has expressed his continuing interest in oceanography. Early in this proceeding, the Court approved the intervention of Harbor Branch and the participation of Seward Johnson as *amicus curiae*.

The central issue presented is what restrictions are imposed on the use of the income from these gifts. The Smithsonian contends that at this time it is free to use the proceeds from both gifts for generalized oceanographic or underwater oceanographic undertakings. Harbor Branch and Mr. Johnson contend that the terms of the two gifts require that the proceeds be used for a specific oceanographic undertaking rather than oceanographic research generally. That specific undertaking is the so-called "Johnson-Sea-Link" submersible program currently being carried on by the Harbor Branch Foundation at Fort Pierce, Florida.

The dispute as to the first gift revolves around a letter of October 17, 1969, from Mr. Johnson to Mr. S. Dillon Ripley, the Secretary and chief executive officer of the Smithsonian.[3] The Smithsonian argues that this letter sets forth all applicable restrictions. It concedes that the primary

---

1. Although this action is technically brought by the United States, the Court for the sake of simplicity generally speaks of the Smithsonian as if it were the petitioner.

2. Harbor Branch Foundation, Inc., a Florida not-for-profit corporation, is the successor of the Harbor Branch Foundation, a charitable trust created by J. Seward Johnson in 1963 for religious, charitable, scientific, literary or educational purposes. *Harbor Branch Foundation, Inc.* assumed the assets and liabilities of the predecessor trust at the beginning of 1975 and continued its activities. As a private non-operating charitable foundation or trust Harbor Branch could make grants for specified pur-

poses but could not itself engage in those purposes. Since its incorporation, Harbor Branch has been recognized by the Internal Revenue Service as a private operating foundation within the meaning of § 4942(j)(3) of the Internal Revenue Code, which enables it to carry out its charitable purposes. Harbor Branch Foundation, Inc. is exempt from federal income taxation under § 501(c)(3) of the Code. References in this Opinion to "Harbor Branch" are to the corporation or the trust, as the context requires.

3. Appendix A.

obligation imposed in that letter was the development of the Johnson-Sea-Link submersible donated to the Smithsonian in 1971 by Johnson and Link, the submersible's designer and inventor. The submersible was being constructed by Mr. Link in 1969 at the time of Johnson's gift. The Smithsonian argues, however, that this primary obligation was fulfilled with the submersible's completion "in the engineering sense" in 1973. Since then, the Smithsonian asserts, it has been free to use the income from the gift for underwater oceanography generally, the residual purpose set forth in the letter.

Alternatively, the Smithsonian argues that if the obligation imposed by the October letter was both to develop and to operate the submersible, it was relieved of that obligation by its determination in 1973 that such a course had become impossible or impractical, a contingency expressly provided for in the October 17 letter. It contends that in 1973 further development and operation of the submersible became impractical because of circumstances arising from a serious accident involving the submersible and resulting in two fatalities. One such circumstance following the accident was the transfer of legal title to the Johnson-Sea-Link from the Smithsonian to Harbor Branch. In turn, Harbor Branch agreed for a time to fund operation of the submersible in return for Smithsonian's assumption of funding of certain other oceanographic endeavors of interest to the Foundation.

As to the Hunterdon gift, the Smithsonian argues that all relevant restrictions are set forth in the trustees' resolution of December 18, 1969, distributing one-half the School's assets.[4] That resolution specified that the gift was to be used for the support of Smithsonian's programs of oceanography, with special emphasis on underwater oceanography.

Harbor Branch responds that the Smithsonian's present obligation is to use the income from both gifts to develop and operate a system of submersibles and support vessels, which it describes as the Johnson-Sea-Link submersible project; that the Johnson and Hunterdon gifts were in effect and should be construed as one; and that the Hunterdon transfer was subject to the same restrictions as the earlier Johnson gift, namely, the funds were to be used for the Johnson-Sea-Link project.

The Foundation finds no integrated trust instrument as to either gift. Accordingly, it maintains that one must look beyond the October 17 letter and the December 18 resolution for other indicators of the restrictions on the two gifts. Harbor Branch would have the Court consider evidence of various circumstances surrounding the gifts, including: statements by the principals, related documentary evidence, the conduct and statements of the Smithsonian officials administering the gifts, subsequent statements of J. Seward Johnson, and present testimony of both Mr. Johnson and the former Hunterdon trustees as to their intentions in 1969. It further argues that whether or not the development and operation of the submersible project became impossible or impractical following the 1973 accident—which it disputes—the submersible program is eminently possible and practical today as demonstrated by its present successful operation at Fort Pierce.

Based upon these considerations, Harbor Branch asks this Court to direct the Smithsonian to use the income from both gifts to support the Johnson-Sea-Link program at Fort Pierce and to reimburse it for certain outlays previously made for this purpose.*

Following a trial on the merits and consideration of the various memoranda, stipulations, depositions and final arguments of counsel, the Court concludes, first, that the Smithsonian is obliged to use the proceeds of the Johnson gift to develop and operate the Johnson-Sea-Link submersible in the manner described at a later point in this

---

4. Appendix B.

* While in its initial pleadings Harbor Branch sought removal of the Smithsonian as trustee

because of a claimed breach of fiduciary duties, in its later pleadings and at trial such relief was not sought.

opinion, and second, that the Smithsonian is free to use the proceeds of the Hunterdon gift to support its programs of oceanography, with special emphasis on underwater oceanography.

The Court's subject matter jurisdiction over this matter is found in 28 U.S.C. §§ 1331 and 1345. Venue is proper under 28 U.S.C. § 1391(b).

The factual findings and legal analysis of the Court are set forth in the discussion which follows:

## FINDINGS OF FACT

### A. The Johnson Gift

The Smithsonian Institution has long been involved in oceanographic undertakings but it was only in the early 1960's that an Oceanographic Sorting Center was established to identify, catalogue, and make available oceanographic specimens from throughout the world. In aid of these underwater endeavors, the Smithsonian has made use of scuba divers and submersibles. Beginning in the mid and late 1960's its oceanographic endeavors were coordinated by Dr. I. Eugene Wallen, as Director of Oceanography and Limnology, and later as Director of the Department of Science. As Assistant Director of Oceanography for the Museum of Natural History, he established the Smithsonian's Sorting Center and in his various capacities, he assumed responsibility for seeking and negotiating contracts, gifts, and grants for oceanography.

In 1963, Dr. Wallen met Edwin A. Link, the noted engineer and inventor, who at the time was designing submersibles and other devices for underwater research. Mr. Link was the inventor of the Link Trainer, a device used to train airplane pilots during World War II. Because of their shared interests, the two collaborated on several Smithsonian projects making use of the submersibles and underwater devices designed by Mr. Link.

J. Seward Johnson and Link were friends and it was through this association that Mr. Johnson became interested in the work of the Smithsonian and later was introduced to Dr. Wallen. Shortly thereafter, in the period 1968–1969, he participated financially and otherwise in several of the Smithsonian's oceanographic projects. In these projects, use was made of a submersible and other equipment designed and developed by Mr. Link.

Subsequently Dr. Wallen and Mr. Link discussed the possibility that Link might develop a submersible for use of the Smithsonian which lacked one of its own. The submersible would be revolutionary in design, having an acrylic sphere to provide unobstructed vision for the pilot and observer and a "lock-out" chamber permitting divers to leave the vehicle while it was submerged. Such direct access to the underwater environment would permit divers to gather specimens which could not be collected by traditional means such as by use of drag nets.

Mr. Johnson, after learning of such plans, became interested in and expressed a desire to participate in development of the submersible. Mr. Link then suggested to his friend that he make a gift to the Smithsonian with instructions that it be used to develop the submersible.

In June, 1969, Mr. Johnson transferred to the Smithsonian a block of Johnson & Johnson stock worth approximately $200,000, to be used for underwater research projects. He suggested to Dr. Wallen that the gift be used in part to construct the submersible in which he and Mr. Link were interested.[5]

In September, 1969, partly at the urging of Dr. Wallen, he decided to make a substantially larger gift. In planning the gift, he was of course mindful of its tax consequences. To preserve his unlimited charitable deduction Mr. Johnson was required to donate a sizeable percentage of his net income to charity each year. Tax considerations also required that his gifts be completed quickly, before the end of that year, and he therefore had to act within a matter of months.

On September 26, Seward Johnson and his attorney, Mr. Robert H. Myers, met

---

**5.** Int. Exs. 1, 2.

informally with Smithsonian officials to discuss a substantially larger gift which Mr. Johnson had under consideration. Smithsonian officials in attendance were Dr. Wallen; Dr. Sidney Galler, then Assistant Secretary for Science; T. Ames Wheeler, Treasurer; and Peter G. Powers, General Counsel. Ms. Iryne Black, a lawyer on Mr. Powers' staff, was also present. Mr. Ripley did not attend.

No agenda was prepared for the meeting. The general outlines of the proposed gift of Johnson & Johnson stock were developed, but the amount of the donation and any specific restrictions were not established. Following the meeting, Mr. Myers served as a liaison between the Smithsonian and Mr. Johnson in working out the details, specific language and terms of the proposed gift.

Immediately thereafter, on September 30, Mr. Johnson informed Morgan Guaranty Trust Company that he would shortly advise them to transfer a specified number of shares of Johnson & Johnson stock to the Smithsonian. He instructed Morgan Guaranty in making the transfer to advise the Smithsonian that the transfer was "for the purposes and uses agreed to by the Smithsonian Institution and [Mr. Johnson] at a conference . . . on . . . September 26, 1969, and that the details of the grant are in the hands of respective counsel." [6]

Morgan Guaranty forwarded a certificate for 14,500 shares of Johnson & Johnson stock to the Smithsonian's Treasurer, T. Ames Wheeler, on October 3, and referred to the "purposes and uses" agreed to at the September 26 meeting and the fact that the details were in the hands of respective counsel as directed by Mr. Johnson.[7] Mr. Wheeler's October 8 letter of acknowledgment recognized that the restrictions on the gift had not yet been established, noting that the stock represented "a gift by Mr. J. Seward Johnson to the Smithsonian Institution for purposes being designated by Mr. Johnson." [8]

It was clearly understood at that time by the Smithsonian, that the purposes of and restrictions on the gift of stock, then valued at approximately $2 million, had not yet been formally designated by Mr. Johnson but would be forthcoming.

During this period, Mr. Myers and Dr. Wallen had a number of discussions regarding the gift. The Smithsonian's General Counsel did not participate in these discussions. While Dr. Wallen made suggestions and had an input in the language used in the gift instrument, he did not make any demands or insist that any particular terminology or form be used. He and the Smithsonian were clearly anxious to secure the gift of stock and were willing to accept the terms imposed by Mr. Johnson.

On October 17, 1969, Seward Johnson sent a letter, drafted with his attorney's assistance, to Mr. Ripley, setting forth his intentions in making the gift. The letter, noting that the gift was an outgrowth of the September 26 meeting, directed:

(1) that the principal of the gift "shall generally be kept intact;"

(2) that the income "be used in the first instance in assuring the successful completion and operation of the research submersible vehicle being given separately by Edwin A. Link and myself;"

(3) that "[i]n the unexpected event that the income and other funds are insufficient to properly equip and operate the submarine, limited emergency use of the principal for this purpose would be appropriate;"

(4) that the fund be designated the " 'Seward Johnson Trust Fund for Oceanography' . . . to assure that the income should be available for broader use in underwater oceanography beyond the life of the specific submersible mentioned here;" and

(5) that "[i]n the event that the development of the planned submersible becomes impossible or impractical, . . . the income will continue to be used for un-

---

6. Int. Ex. 9 at 2.

7. Int. Ex. 14.

8. Int. Ex. 15.

derwater oceanography and, if funds are sufficient, for other oceanographic purposes."

The letter was an instrument of gift and set forth in full its purposes and restrictions. Mr. Johnson did not reserve in the instrument the right to terminate, alter, modify, or amend the terms of the gift nor did he provide for reversion under any circumstances. It was otherwise a clear expression of intent. The stock was given in trust and the Smithsonian was to serve as trustee. As evidenced by the letter, "the principal [was to] generally be kept intact" and the fund designated as the "Seward Johnson Trust Fund for Oceanography." The primary objective of the trust was to assure the successful development and operation of the submersible then being constructed by Edwin Link, subsequently named the Johnson-Sea-Link.

Mr. Johnson intended his gift to be used to operate as well as develop the submersible. His letter specifically states that the income was to be used "in assuring the successful completion and operation" of the submersible. All efforts, including even the extreme step of invasion of principal, were to be made "to properly equip and operate" it. Finally, the gift was placed in trust to provide for broader use in oceanography "beyond the life of the specific submersible mentioned here."

On October 17, the submersible was not a finished vessel but under construction and development on Mr. Link's drawing board. Mr. Johnson was thus not in a position to specify how it should best be equipped or operated or what was necessary to assure its successful completion and operation. He intended, however, that all necessary steps be taken to achieve that result.

It is generally recognized that the development of an invention such as the Johnson-Sea-Link involves by definition a continuing series of progressive changes. According to Mr. Link, a model prototype is never completed. Dr. Wallen similarly acknowledged that there was a constant, evolutionary process for an invention and that the Johnson-Sea-Link was not yet complete.

The October 17 letter does not specify the steps the Smithsonian should pursue to properly equip and operate the submersible and to assure its successful development. However, the trial testimony, not disputed in any manner, established that several measures are necessary: namely, a tender vessel and a second submersible to the extent that it is needed for safety reasons.

A tender vessel, sometimes referred to as the mother ship, performs various necessary functions. It transports the submersible and its prospective occupants to the area of operations, launches and recovers the vehicle, and keeps watch on and communicates with the submersible while on its mission. Finally, most of the maintenance to the submersible is undertaken from the deck of the tender vessel.

Roger Cook, Harbor Branch's director of submersible operations, explained the various functions of the tender vessel. An important consideration, he claimed, was that with a support vessel for transportation, submersible operations could be conducted ten to twenty miles from the shore and a number of dives completed over a period of several days. Without a mother ship only one dive could be undertaken. By way of illustration he testified that the Johnson-Sea-Link was engaged in such an extended mission in searching and exploring the U.S.S. Monitor, a Civil War vessel submerged off the North Carolina coast.

Mr. Cook had more than ten years' experience piloting and operating submersibles including four years in the Navy before coming to Harbor Branch. In his approximately 600 submersible dives, only three or four had been without a tender vessel and these had been in the confines of a canal, not in the "hostile environment of the ocean."

The Johnson-Sea-Link has been approved to conduct dives to a depth of 1000 feet. A separate decompression chamber, like that aboard the Johnson-Sea-Link's tender vessel, the R/V Johnson, is required by the Occupational Safety and Health Administration for submersible dives below 200 feet. While the Occupational Safety and

Health Act[9] was not passed until 1970, its regulations are nonetheless applicable and binding as related to the proper equipment and operation of the Johnson-Sea-Link.

Moreover, the Smithsonian has recognized that the R/V Johnson, its handling crane, and the Johnson-Sea-Link are part of an integrated system. In its annual report for fiscal 1973, *Smithsonian Year 1973*,[10] the Institution observed that a crane to launch and recover the Johnson-Sea-Link from the R/V Johnson had been developed, "complet[ing], the mother-ship-submersible-diver system."

Harbor Branch operations director Cook also testified to the need for a second submersible such as the Johnson-Sea-Link II for possible rescue in the event of an emergency. When operations are conducted some distance from shore, the second submersible may accompany the first to the site of operations to be available there; on other occasions, it remains in readiness at the home port.

According to Cook's undisputed testimony, a second submersible is the safest system for rescue of a submersible in distress. Mr. Link recognized from the beginning that a second submersible would be needed for rescue purposes. This need was demonstrated by the tragic accident of June, 1973.[11]

The value of a second submersible for safety was also recognized by Smithsonian officials and publications. *Smithsonian Year 1974*,[12] the Institution's fiscal 1974 annual report, described the status of the Johnson-Sea-Link and stated, "a sister submersible with lockout capability can be viewed as an excellent rescue mechanism."

Dr. H. Adair Fehlmann, Director of the Smithsonian's Fort Pierce Bureau from late 1972 to early 1977, testified that after the 1973 submersible accident, Mr. Link made a "very good" argument that "the best way to rescue an entrapped submarine was to have another that could actually go down

and perform the work, instead of trying to do it from the surface." The former Director declared that after the accident, it "became almost an imperative thing to have a way for rescue."

■ In light of these facts, the Court finds first, that a tender vessel and handling system are necessary to a successful submersible operation; and second, that the Johnson gift should be used to fund the Johnson-Sea-Link II to the extent that its use is necessary to the safe operation of the Johnson-Sea-Link.

In permitting the use of his gift for broader oceanographic purposes if the development of the planned submersible became "impossible or impractical," Seward Johnson was concerned with whether the submersible was going to work. This concern encompassed impracticality or obsolescence from a scientific standpoint as well as impossibility occasioned by something happening to Mr. Link.

There is no evidence that Mr. Johnson intended to leave the impossibility/impracticality determination to the discretion of the Smithsonian. Regardless of the precise meaning of the terms, the development and operation of the Johnson-Sea-Link is neither impossible nor impractical at this time. Its current successful operation by Harbor Branch in cooperation with Smithsonian scientists[13] makes this clear.

The Smithsonian, through the actions and expressions of its principal officials charged with the responsibility for the Johnson gift, has recognized in various ways that the gift was restricted to support of the Link submersible program. It has also recognized that this restriction required the income from the gift of stock to be used to operate the Johnson-Sea-Link and its tender vessel R/V Johnson after they were completed. Examples of this recognition abound in the record and the following are illustrative. An August 1970 "Newsletter to the Re-

9. Pub.L. No. 91–596, 84 Stat. 1590 (1970).

10. Int. Ex. 199 at 99.

11. *See infra* at 1234.

12. Int. Ex. 200 at 66.

13. *See infra* at 1235.

gents, Smithsonian Institution from the Office of the Secretary,"[14] described the Johnson-Sea-Link and informed the Regents that:

> In addition to the funds and direct support made available by Ed Link, an endowment for further operation of the submarine has been made by Seward Johnson.

The Johnson-Sea-Link was commissioned in January, 1971. On that occasion Mr. Ripley presented to Link and Johnson a medal for "conception and development of the *Johnson-Sea-Link*." An accompanying citation described the Johnson-Sea-Link as "the first of a pioneer class of submersible research vehicles." In reporting that event, *Smithsonian Year 1971*, stated that Mr. Johnson "had not only provided substantial support to the project but also gave an endowment for its operation." [15]

The Smithsonian's succeeding annual report [16] commented on the establishment of the Fort Pierce Bureau:

> The generous support of Edwin A. Link and J. Seward Johnson has enabled the Smithsonian to establish, on 16 October 1971, the Fort Pierce Bureau as an operating unit . . . . Directed by I. Eugene Wallen, . . . the new Bureau has a mission of marine biological and geological research, using the *Johnson-Sea-Link* and other submersibles as well as the oceanographic vessels *Johnson* and *Sea Diver*.

Finally, an interchange in late 1972 between Seward Johnson and Dillon Ripley provides probative evidence of the terms and conditions of the Johnson gift. The evidence is found in admissions and concessions made by Mr. Ripley. At trial he testified about a letter he wrote to Mr. Johnson on November 17, 1972,[17] which referred to an invasion of the Johnson gift principal to refit the submersible. The letter stated in part that depletion of principal would "result in a corresponding reduction in Smithsonian's ability to fund future oceanographic research studies as originally contemplated by Smithsonian and the other cooperating parties at the time of undertaking this joint effort. . . ." This letter was followed by a November 30 telephone conversation between the two. Mr. Ripley testified that he began the conversation by stressing Smithsonian's "purpose in science," and at that point he was severely challenged by Mr. Johnson for not observing and complying with the terms and conditions of his gift and for failure to give proper attention to the tender vessel.

After the telephone call, Mr. Ripley prepared a confidential memorandum to the file dated December 1, 1972.[18] The memorandum states that there were "strings attached" to the gift by the original documentation, but he "had forgotten totally," having "an overly easy way of putting such things out of my mind." He expressly described the restrictions on the gift:

> The "strings" were that the money was given us for equipping and outfitting and "operating" the *Johnson-Sea-Link*. You cannot operate the submersible without a tender. The tender is to be the "MV Johnson."

Mr. Ripley suggested at trial that his awareness of the strings discussed in the December memorandum had come from Mr. Johnson; that he couldn't recall having gone back to "the original documentation" to find out what those strings were. The memorandum itself states, however, that

> after my Thursday telephone call . . . Ames Wheeler brought [the original 1969] agreement to my attention, when phone calls from Florida . . . alerted us to the fact that my somewhat trigger happy unprepared call to Johnson had failed.

While the Smithsonian Secretary may not have gone back to the original documentation himself, it appears that he was familiar with it before his memorandum was prepared.

---

14. Int. Ex. 21 at 9.

15. Int. Ex. 197 at 60.

16. Int. Ex. 198 at 80.

17. Pet. Ex. 90.

18. Pet. Ex. 95.

Based upon the foregoing, the Court finds that a support vessel such as the R/V Johnson is an integral part of the submersible system and is necessary to successful and proper submersible operations. The Court also finds that a second submersible is encompassed within the terms of the Johnson gift to the extent it contributes to the successful and safe operation of the Johnson-Sea-Link.

## B. The Hunterdon Gift

The Hunterdon Medical Center School of Health fell short of expectations and did not develop into a functioning school with a regular curriculum and full complement of students. In fact, the School which was established in 1965, was dissolved by 1970.

Attorney Myers became concerned that failure could jeopardize the deductibility of his client's contributions to establish the School and otherwise present tax problems. In January, 1969, he expressed this concern to Garrett Heher, counsel for Hunterdon; it was in turn communicated to and shared by the Hunterdon trustees. Mr. Myers also advised Mr. Johnson and the trustees that if the School were dissolved, its assets should be distributed to a qualified institution to protect Johnson's charitable deductions. He further informed him that having made an irrevocable gift, it was the trustees' and not Johnson's role to decide what should be done with the School's assets if it were dissolved.

Three trustees administered the Hunterdon School. They were all close associates of Seward Johnson and had known him long before the organization of Hunterdon in 1965. Phillip Hofmann and Gustav Lienhard had served with him as executives at Johnson & Johnson; Lloyd Wescott was a neighbor in New Jersey. Because of these relationships, the trustees were anxious to heed Mr. Johnson's wishes in their decisions regarding the Hunterdon School.

The less than arm's length relationship between Mr. Johnson and the trustees was a source of confusion and dispute over the restrictions on the Hunterdon gift. In theory, the trustees had control over the School and its assets. In practice, they allowed Mr. Johnson—primarily through his attorney Myers—to exercise considerable influence. On occasion, they failed to act decisively and independently and permitted Seward Johnson and his attorney to shape their decisions as trustees.

Mr. Myers, however, was concerned primarily with the tax consequences for his client stemming from a dissolution of Hunterdon and a transfer of its assets. He did not seek to instruct the trustees on behalf of Mr. Johnson of any conditions or restrictions his client wished to have placed on a transfer of the Hunterdon assets to the Smithsonian. Nor on the other hand did the trustees seek from him or Mr. Johnson any specific instructions on a gift of the School's assets. Nor did they instruct Myers to develop a set of restrictions which would tie a possible gift to particular Smithsonian programs of interest to Seward Johnson. Any such suggestions or intimations by Myers were not authorized by the trustees. Indeed, in the fall of 1969, when they decided to dissolve the School, they were unaware of the submersible being constructed by Edwin Link. They were aware, however, of Mr. Johnson's more generalized interest in oceanography and it was this interest that they determined to further.

While the trustees were content to have Myers explore the tax aspects and work out the mechanics of a possible transfer to the Smithsonian, they did not authorize him to establish the restrictions on the gift. In discussions during the fall of 1969, the attorney raised with Smithsonian officials Wheeler and Powers, the possibility that a substantial gift might be made to the Institution. In pursuing the matter, he inquired whether the Smithsonian qualified as the type of charitable organization that would preserve the tax deductions arising from Mr. Johnson's original gift to Hunterdon.

Most of the contacts were between him and Smithsonian Treasurer, Ames Wheeler. However, Myers' law partner, James Quiggle, had at least one conversation with Mr. Powers about the form and language of the potential gift in which he inquired whether

there was any special form in which a gift of the kind contemplated had to be made. The Smithsonian General Counsel suggested appropriate words and phrases for the general oceanographic purposes of the proposed gift as described by Mr. Quiggle.

In his conversations with Wheeler, the Treasurer, Mr. Myers did not say that the trustees wanted to link the proposed Hunterdon gift to Mr. Johnson's earlier gift. Nor did he say that he represented Hunterdon School as its attorney. In fact, at one point he stated that Hunterdon was represented by a different attorney, Garrett Heher. Indeed, it does not appear that any attorney was officially retained or designated by the Hunterdon trustees to represent them in this regard.

Mr. Wheeler knew Myers as Seward Johnson's attorney and believed him to be furthering Johnson's interest in the School's dissolution. In November, for example, Myers told him that he was authorized by Mr. Johnson to inform the Smithsonian that his client wanted one half of the Hunterdon assets to go to the Smithsonian for oceanographic work. Although Mr. Myers did represent two of the Hunterdon trustees in some matters, he did not advise Wheeler of this fact.[19]

When the gift was made, none of the trustees had seen Seward Johnson's October 17, 1969 letter of gift to the Smithsonian nor were they aware of his earlier June, 1969 gift. They never considered limiting the Hunterdon gift to the restrictions of Mr. Johnson's prior gift to the Smithsonian. Nor did they consider tying the gift in any way to the Harbor Branch Foundation.

In distributing the assets, they did desire to take Mr. Johnson's generalized interest in oceanography into account. Thus on December 18, 1969, they adopted the following resolution:

> RESOLVED that one-half of all of the remaining assets of the School be distributed to the Smithsonian Institute [sic], Washington, D. C., an establishment for the increase and diffusion of knowledge among men, for the support of its programs of oceanography, including the education, research and publication connected therewith with special emphasis on underwater oceanography; . . .

The resolution reflected the earlier conversation between Mr. Quiggle and Mr. Powers in specifying oceanography as the basic restriction on the gift which had an approximate value of $3.6 million. No power was retained to change the gift's restrictions.

After the trustees' resolution and after Smithsonian had received a part of the Hunterdon distribution, Mr. Myers without consulting the trustees informed the Smithsonian's Treasurer of his views regarding the limitations on the Hunterdon funds. In a letter of April 1, 1970,[20] he quoted the December 18 resolution in full. Then he added two clarifying sentences of his own. Harbor Branch relies heavily on the second as evidence that the Hunterdon gift must be used to support the Johnson-Sea-Link submersible project. The first, however, can be read as support for the Smithsonian's position. Mr. Myers wrote: "I conclude that the funds are restricted to support the programs of oceanography and matters related thereto. In short, it is my opinion that these are capital to be treated as the funds from Mr. Johnson are to be treated."

The Myers' letter was occasioned, as it explained, by an inquiry from Dr. Wallen as

---

19. Mr. Johnson's attorney, Robert Myers, while not the attorney for the Hunterdon School or its board of trustees, did represent two of the trustees in several capacities. Harbor Branch thus contends that Mr. Myers was representing the trustees in his various contacts with the Smithsonian regarding the Hunterdon gift. The Smithsonian insists that he was exclusively Mr. Johnson's agent. The evidence itself is somewhat unclear given the various interrelationships among the parties and given the contacts between Johnson and Myers on the one

hand and Myers and two of the trustees on the other. Indeed, Myers exclaimed at trial:

> To tell you the truth, I don't know who I represented. I represented by mutual understanding, I presume each party.

What is clear, however, is that Myers was not authorized by or an agent of the trustees for the purpose of tying the Hunterdon gift to the submersible being developed by Edwin A. Link.

20. Pet. Ex. 38.

to whether there were any specific restrictions on the Hunterdon gift. The Smithsonian had not received a copy of the trustees' resolution and indeed did not do so until Mr. Myers' April 1 letter transmitted its text. Here again the record is plagued by the confusion of roles as between the trustees on the one hand, Mr. Johnson and his attorney on the other. While the trustees would probably have approved Myers' transmission of the resolution, there is no evidence that his views of the gift's restrictions were authorized by them.

Based on the foregoing, the Court finds that the Hunterdon trustees intended that the transferred assets be used for the support of the Smithsonian's general oceanographic programs including education, research, and publication and with special emphasis on underwater oceanography, without further limitation or restriction, to be used in such specific ways as the Smithsonian saw fit. The Court does not find that the trustees intended that the assets be added to the submersible program established by Mr. Johnson's prior gift.

The Hunterdon gift was placed in the same endowment fund as the Johnson gift. This was done by Ames Wheeler, Smithsonian's Treasurer, because he thought it would be simpler to administer the two together. The decision was a unilateral one. He did so under his own authority and continued to maintain the two gifts in the same fund despite suggestions from the Smithsonian's General Counsel that they be separated given their differing restrictions. Mr. Wheeler says that he placed the gifts in the same fund because he believed that once the submersible being developed by Mr. Link was operational, the Johnson gift would be available to support the same oceanographic programs that the Hunterdon gift would support.

The Hunterdon and Johnson funds have been administered together by the Smithsonian at all times. Until 1974, when the Smithsonian stopped paying for the Johnson-Sea-Link project, it used the income generated from both gifts to finance the submersible project. In so using the Hunterdon funds, the Smithsonian was simply exercising its discretion under the terms of the Hunterdon gift, the submersible program being a permissible expenditure for underwater oceanography.

### C. The Years of Cooperation

To the extent that Mr. Johnson's relationship with the Hunterdon trustees was one source of confusion, his relationship with the Smithsonian was a second. At the start his contacts with the Smithsonian were cordial and harmonious. Although not required by the terms of the Johnson gift, the Smithsonian permitted him to play an active role in the development of the submersible which it was financing with the two gifts.

During the early period the relationship was mutually beneficial but it soured with the passage of time. The Smithsonian through its "partnership" with Mr. Johnson was able to secure additional resources to develop the Johnson-Sea-Link. Smithsonian officials, for example, were able to persuade Mr. Johnson to provide about one half million dollars to refit the R/V Johnson, the tender vessel for the Johnson-Sea-Link. Since at least some of the Smithsonian staff were hopeful that Mr. Johnson would at some point donate other, and perhaps even larger, monies to the Institution, they acceded readily to his wishes and were not inclined to offend him in any way.

Seward Johnson for his part oversaw the submersible project which the Smithsonian had the responsibility to fund through his gift. His friend, Edwin Link, also had a necessary participating role. Their interests continued and they had an active role in the submersible project. Later, Johnson decided to restructure Harbor Branch from a private foundation trust which could make grants to other entities to be used for specified purposes, to a private operating foundation which could independently carry out the specific purposes for which it was established. The change was effected in December, 1971.

By mid-1971, Harbor Branch was actively engaged in the submersible project, along with the Smithsonian and Mr. Link's Sea

Diver Corporation at Fort Pierce, Florida. In the fall of 1971, the Smithsonian, through the support of both Johnson and Link, also established a Bureau at Fort Pierce. The Smithsonian Bureau worked closely with Harbor Branch, using its laboratory facilities and sharing professional employees. Dr. Eugene Wallen was both Director of Harbor Branch's science program and of the Smithsonian Bureau, with management responsibility for both. As already noted Harbor Branch was reclassified as an operating foundation.

This close working relationship between the Smithsonian's Fort Pierce Bureau, and Harbor Branch and Mr. Link, continued into 1973. Their joint efforts were focused on the development of the Johnson-Sea-Link submersible project. Edwin A. Link was essentially in charge of the operation and performance of the vessels. The area of responsibility of Smithsonian's Fort Pierce Director was to approve specific cruises, most of which were still in the nature of "shake-down" cruises.

### D. The 1973 Accident and Later Developments

In June, 1973, the Johnson-Sea-Link while engaged in an underwater dive, was involved in a serious accident. The submersible was ultimately recovered. However, two Smithsonian employees aboard were killed, one of whom was Edwin Link's son.

The accident was investigated by the United States Coast Guard and a special expert review panel convened by the Smithsonian. While changes in design, equipment, and management of the submersible were recommended, the reports did not indicate that the submersible was inherently unsafe or unworkable, or that its development was impossible or impractical.

### E. The Post-Accident Compromise

The accident did not augur well for the relationship. The Smithsonian became concerned about its potential liability arising from the submersible operation. The Institution also considered the more basic question of whether it should be in the submers-

ible operations business at all, recognizing that it did not have the expertise, independently of Harbor Branch, to operate the Johnson-Sea-Link. Finally, the Smithsonian had reservations about the project because of difficulties encountered by its staff in dealing with Edwin Link and his half-sister Marilyn Link on issues of the submersible's management.

In turn, Johnson and Link were concerned that they would no longer be able to play a direct role in the submersible's development and operation. Partly to ward off this possibility, Mr. Johnson proposed that Harbor Branch take over the Johnson-Sea-Link and the R/V Johnson. A reason advanced for the transfer was the expertise of Harbor Branch employees in submersible operations. The Smithsonian was favorably inclined to the offer since it would render unnecessary a decision by the Institution regarding the future of the Johnson-Sea-Link.

The two sides, by mutual agreement, altered their financial and operating relationships, but without any alteration of the terms of the two gifts now at issue. Harbor Branch was given full authority over submersible operations shortly after January, 1974. Legal title to the Johnson-Sea-Link and the R/V Johnson was transferred to the Foundation in November, 1974. The two vessels had a market value of approximately $1.5 million at the time of transfer. Harbor Branch paid less than $50,000 for the government equipment aboard the vessels and recorded the remaining value of approximately $1,450,000 as a donation from the Smithsonian.

Before submersible operations were resumed in March, 1974, Harbor Branch complied with all of the Coast Guard recommendations. In addition, safety improvement recommendations of the Smithsonian Panel were implemented. Since its return to service in 1974, and by the time of trial, the submersible had completed more than 400 dives.

As part of the arrangement whereby Harbor Branch assumed control over the submersible program, the Smithsonian and

Harbor Branch agreed to pool on a year-to-year basis their resources including the income from the Johnson gift, the Hunterdon gift, and the Harbor Branch Foundation to finance their joint projects. The Smithsonian was relieved of any further funding of the submersible program. It in turn agreed to use the funds so freed for oceanographic projects of interest to Mr. Johnson, and in particular the Indian River Coastal Zone project, a study of the effects of pollution which had previously been paid for by Harbor Branch.

### E. Termination of the Relationship

In the spring of 1976, the financial pooling arrangement between the Smithsonian and Harbor Branch began to deteriorate. The Smithsonian, and in particular Dr. Challinor its science head, raised questions about the use of Smithsonian funds for the Indian River project and the Fort Pierce arrangements generally, concluding that Harbor Branch's goals were quite remote from the Smithsonian's. At the same time he recommended that the Smithsonian consider steps to establish its independence of Harbor Branch. Sensing a new attitude, Seward Johnson sought to reassert his control over how the income from both his and the Hunterdon gifts was spent. In so doing, he sought to add restrictions that were not a part of the original gifts.

In response to these various pressures, the Smithsonian sought to limit and initiated cutbacks on its support of projects of interest to Harbor Branch. Of particular significance was the termination of the employment of some six to eight scientists on the Indian River project. Mr. Johnson and Harbor Branch responded with a demand that the Smithsonian resume payment for submersible operations in accordance with the terms of Mr. Johnson's original gift. Mr. Johnson demanded that the Smithsonian pay for the Johnson-Sea-Link, the second submersible—the Johnson-Sea-Link II, the tender vessel—the R/V Johnson, and several other vessels.

The Smithsonian refused Mr. Johnson's demand and in addition brought the present action seeking construction of the terms, conditions and pertinent restrictions on the Johnson and Hunterdon gifts.

While the initial January, 1977 demand sought reimbursement of the cost of operating the submersible program in fiscal 1977, Harbor Branch in its request for an accounting and reimbursement seeks considerably less in recognition that its earlier demand would require an invasion of principal. Nonetheless, it asks for all the income from the Johnson and Hunterdon gifts for operation of the submersible program it now runs at Fort Pierce. Such a sum, it emphasizes, will not cover the amount needed to cover one submersible and a tender vessel for a year. Harbor Branch asserts a willingness to pay the additional funds necessary to operate the submersible program.

The maintenance and operation of the Johnson-Sea-Link, the tender vessel, and the second submersible and their use for scientific research continue under the direction of Harbor Branch. Its science program has a staff of approximately 150 employees, including a science staff of 37. It continues to work on a professional level with Smithsonian personnel, both visiting Smithsonian investigators and two resident Smithsonian scientists. Harbor Branch also continues to make the Johnson-Sea-Link available to the Smithsonian.

### LEGAL ANALYSIS

There is well recognized authority for the principle that in construing a trust the court will endeavor to determine and to effectuate the ideas and purposes of the settlor at the time the trust gift was established. *Smith v. Bell*, 31 U.S. (6 Pet.) 68, 74–75, 8 L.Ed. 322 (1832). In *Albright v. United States*, 308 F.2d 739 (5th Cir. 1962), the issue presented for decision was whether income from a trust gift was a present or future interest. In addressing the issue and construing the trust terms to resolve the question, the court noted, "The intent and purpose of the settlor is the law of the trust." *Id.* at 743. Likewise, in *Purifoy v. Mercantile Safe-Deposit & Trust Co.*, 398 F.Supp. 1075, 1077–1078 (D.Md.1974), the trial court stated:

The basic function of a court in the construction of wills or deeds of trust is to ascertain and effectuate the intention of the testator or settlor. . . . The intention of the testator is found first in the instrument itself and the plain meaning of the words used therein. [Citations omitted.]

Other authorities are equally clear.

In determining the terms of the trust, resort is had in the first place to the instrument if any under which the trust is created. As to any matter expressly covered by the instrument, the provisions of the instrument, if unambiguous, determine the terms of the trust. In such a case, extrinsic evidence in the absence of fraud or mistake is not admissible to vary or add to the terms of the instrument.

\* \* \* \* \* \*

The terms of the trust are determined by the intention of the settlor at the time of the creation of the trust, and not by his subsequent intention.

II Scott on Trusts § 164.1 at 1257, 1260 (3d ed. 1967).

Where there is a written expression of intention, free of ambiguity, the writing itself is sufficient. In the absence of such writing or should the writing in some respect be lacking, the court may then consider all facts and circumstances which might possibly aid in construing the terms of the trust. *Lowrey v. Hawaii*, 206 U.S. 206, 219–20, 27 S.Ct. 622, 51 L.Ed. 1026 (1907); IX Wigmore on Evidence § 2425 at 75–79, § 2429 at 95–96 (3d ed. 1940).

### The Johnson Gift

The terms of the Johnson gift set forth in the October 17, 1969 letter, to the extent that they are clear and unambiguous, cannot be contradicted or varied by extrinsic evidence since the letter was a declaration and manifestation of Mr. Johnson's intent in making the gift. The Court agrees, however, that certain of the letter's phrases are ambiguous and therefore looks to extrinsic evidence to construe them.

It was because of the close association between Seward Johnson and Edwin Link and his submersible program that the Smithsonian and Mr. Johnson were introduced to each other. Seward Johnson's interest in the development of the Link submersible, which the Smithsonian shared—was the circumstance that brought the two together. Without Edwin Link's suggestion and overture, it is unlikely that the Smithsonian would have received any gift from Mr. Johnson. His initial $200,000 gift of Johnson & Johnson stock in June 1969 was with the understanding that it be used in part to construct the Link submersible. The outlines of a substantially larger gift were discussed at the September 26, 1969 meeting between Mr. Johnson and Smithsonian officials and the subsequent letters of instruction and transmittal of funds are all relevant and reflect Seward Johnson's intent.

The plain language of the letter makes clear that the stock gift was to be used both to develop and to operate the Link research submersible as then known to him. The phrases "in assuring the successful completion and operation of the research submersible vehicle," "to properly equip and operate the submarine," and "beyond the life of the specific submersible mentioned here," all demonstrate his intent in this regard. They also make clear that Mr. Johnson's gift was to be used to develop and operate one vessel —"the research submersible vehicle being given separately by Edwin A. Link and myself." [21]

21. Harbor Branch has sought to admit certain notes taken at the September 26 meeting and a typed memorandum summarizing those notes, each prepared by Iryne Black. Ms. Black was not deposed by either party in this proceeding nor did she testify at trial. Harbor Branch proffers the documents as evidence that Mr. Johnson's objective was to fund a series of submersibles and support vessels.

The Court will not admit the documents. They present questions of adequate identification and proper foundation. Although Ms. Black was an attorney, her role in the meeting was never clearly defined. Her observations cannot be construed as an admission against interest by the Smithsonian, Fed.R.Evid. 801(d)(2). The Court notes, however, that consideration of the documents would not alter the conclusions reached.

What is not clear, however, were the particular steps required to complete, properly equip and operate it. The letter does not establish any criteria or independent mechanism to define them.

For an answer the Court must look beyond the four corners of the October letter. The very magnitude of the gift, Johnson & Johnson stock valued at approximately $2 million, reflected an expectation that all necessary steps would be taken to develop and operate the submersible. Further evidence of this was the informal and amicable manner in which the stock transfer was accomplished and Smithsonian's readiness to comply with Mr. Johnson's suggestions and conditions. What was also necessarily understood was that—since the primary purpose of the gift was to develop and operate a submersible under design by Edwin Link—he would play an important role.

Since the submersible was still under construction in 1969, the Court must also look to the circumstances and events following the transfer to determine what was implied by Mr. Johnson's phrases. Of particular relevance is the testimony of Roger Cook, Harbor Branch's director of operations, regarding the need for a tender vessel and a second submersible.[22] Also instructive are the subsequent statements and conduct of the Smithsonian and its officials relating to the measures necessary to develop, equip and operate the Johnson-Sea-Link. The circumstances surrounding and following the 1973 accident, particularly Smithsonian's recognition that it lacked the expertise in the area, as expressed in part by transfer of title to the Johnson-Sea-Link to Harbor Branch, are most instructive.

Also relevant are the subsequent expressions of the Smithsonian,[23] in publications and statements of its officials, regarding the measures necessary to develop and operate the submersible. Those representations made long before the present litigation reflect the Smithsonian's acknowledgment of the Johnson gift's restriction to support the Johnson-Sea-Link. *Hamilton National Bank v. Hutcheson*, 357 F.Supp. 114, 118 (E.D.Tenn.1973), *aff'd sub nom. Hamilton National Bank v. Meadow*, 492 F.2d 1243 (6th Cir. 1974); *Buhl v. Kavanagh*, 118 F.2d 315, 321 (6th Cir. 1941); *Haliday v. Haliday*, 56 App.D.C. 179, 11 F.2d 565 (1926); *Matthews v. Jeremiah Burns, Inc.*, 205 Misc. 1006, 129 N.Y.S.2d 841, 850 (1954); Bogert, Trusts & Trustees § 50 at 406–07 (2d ed. 1965). They weigh heavily and cannot in any sense be considered sparingly. The restrictions set forth in—and implicit in—the October 17 letter are evidenced further in the November-December 1972 exchange between Seward Johnson and Dillon Ripley. The Secretary suggested to Mr. Johnson in a telephone conversation that Smithsonian's scientific research efforts had priority in the application of the trust income rather than the development and operation of the submersible and its support vessel. The suggestion was immediately challenged and rejected by Seward Johnson and the record shows that Mr. Ripley acceded to and acknowledged his protest.[24]

These various circumstances and expressions are more instructive and persuasive than the at times self-serving statements and conduct of Smithsonian officials and Mr. Johnson and Harbor Branch and the exchanges between them relating to their perceived restrictions on the gift.

The Court thus concludes that the steps necessary to assure the "successful completion and operation" and "to properly equip and operate" the Johnson-Sea-Link include the use of a tender vessel such as the R/V Johnson, and in light of the 1973 accident, a second submersible to the extent necessary to operate the Johnson-Sea-Link successfully and safely. These phrases, when read in connection with the transfer of title and

---

22. *See supra* at 1228–1229.

23. *See supra* at 1229–1231.

24. *See supra* at 1228–1231.

operational responsibility for the vessels in recognition of Smithsonian's lack of engineering expertise and experience, oblige the Smithsonian to continue to fund the submersible operation through its Fort Pierce, Florida Bureau, in cooperation with Harbor Branch. This obligation will remain so long as Harbor Branch is in a position and expresses a willingness to operate the Johnson-Sea-Link in cooperation with the Smithsonian.

■■■ The Smithsonian cannot refuse or be absolved of responsibility to fund the submersible because it no longer possesses title or because Harbor Branch, for a time, assumed the costs. A trustee cannot by its own acts produce changed conditions which frustrate the donor's intention and relieve the trustee of primary trust obligations. *See Connecticut College v. United States*, 107 U.S.App.D.C. 245, 251–52, 276 F.2d 491, 497–98 (1960). Nor does it follow from the Smithsonian's duty to fund the Johnson-Sea-Link that Harbor Branch must return the vessel.

There are several reasons for this conclusion. First, there is nothing in Mr. Johnson's letter that specifies that the Smithsonian itself must be the instrumentality to develop and operate the submersible. The income from the stock was to be used in assuring the successful completion and operation of the submersible. The Smithsonian was not given any discretion in use of the funds so long as the Johnson-Sea-Link remained viable. The letter did not require the Smithsonian to develop the submersible or specify that it could not "contract out" the responsibility. And indeed, as already noted, since Mr. Link invented the submersible, it was always assumed that he would play a continuing role in its development and operation.

Second, this result is compelled by the Court's duty to effectuate the purposes of the trust. *Connecticut College, supra.* When the Smithsonian transferred title, it readily acknowledged that it did not have

Harbor Branch's expertise to refine and make the necessary modifications for safe and successful operations. Nor has the Smithsonian presented any evidence that it now has acquired such know-how.

Accordingly, the Court concludes that continued funding of the Johnson-Sea-Link through the Smithsonian's Fort Pierce Bureau and in cooperation with Harbor Branch is the most reasonable, and perhaps the only reasonable way to assure its continued successful development and operation. It is possible given Harbor Branch's particular expertise in the area, that when it is no longer in a position to operate the Johnson-Sea-Link, that such operation indeed will become "impossible or impractical."

■■■ In reaching these conclusions, the Court is mindful that the trustee of a charitable trust may join with another in administering the trust. A trustee may also transfer trust assets or title to the object of the trust to an independent instrumentality to implement or facilitate the purpose of the trust. But none of these actions relieves the trustee of restrictions placed on trust funds by the settlor. *Bertram v. Berger*, 1 Ill.App.3d 743, 274 N.E.2d 667, 670 (1971); *Pennsylvania Co. for Insurances v. Contributors to Pennsylvania Hospital*, 63 R.I. 466, 9 A.2d 269, 273 (1939); Bogert, Trusts & Trustees § 393 at 235–242 (rev. 2d ed. 1977). Similarly, a trustee is not relieved of his obligations when they are voluntarily assumed and performed by another. *Humphrey v. Board of Trustees of I.O. O.F. Home*, 203 N.C. 201, 165 S.E. 547, 549 (1932). A change in the manner of administration of a trust will not be permitted where its effect would relieve the trustee of his obligations. *Attorney General v. President & Fellows of Harvard College*, 350 Mass. 125, 213 N.E.2d 840, 852 (1966).

Termination of the financial pooling arrangement in late 1976 returns the parties to their prior status. The Smithsonian is now obligated to use the trust income, in

strict accordance with the trust terms, to develop and operate the Johnson-Sea-Link.

Such purposes have proven to be possible and practical, and Harbor Branch is presently an appropriate instrumentality for their accomplishment as demonstrated over the past four years in its use of the submersible for underwater oceanography in cooperation with Smithsonian scientists and others. The Smithsonian, of course, can require from Harbor Branch whatever accounting and other reports are necessary to assure that trust income, supplied for maintenance and operation of the submersible, is being applied in full accordance with those requirements. The Smithsonian can also exercise an oversight function as in the past. In addition, the Institution may choose to have a role in the management and operation of the submersible.

The Court further concludes that the Smithsonian is obligated to reimburse Harbor Branch for the expenses of operating the submersible program, paid under protest during those years following the collapse of the financial pooling arrangement.

### B. The Hunterdon Gift

The legal authorities and guidelines employed in the analysis of the Johnson gift apply with equal force in construing the terms and conditions of the Hunterdon gift. The critical questions are what was the intent of the Hunterdon trustees and was there a single integrated expression of that intention. The answers are clear and certain.

The trustees' resolution of December 18, 1969, distributing one-half of Hunterdon's assets to the Smithsonian, was intended by them, and understood by the Smithsonian, to set forth completely and finally all restrictions applicable to the gift. The language used in the resolution is straightforward and free of ambiguity. It restricts Smithsonian's use of the gift to the "support of its programs of oceanography, including the education, research and publica-

tion connected therewith with special emphasis on underwater oceanography." The meaning of the restriction on the gift to "its programs of oceanography" is clear; the gift was to support Smithsonian programs of oceanography. There is no reference in the resolution to the funding of submersibles or tender vessels nor is there any suggestion that the restrictions on the gift are in any way related to the restrictions on the earlier Johnson gift.

Under the circumstances, proof of prior or contemporaneous additional or different terms is unwarranted and unnecessary. Even if extrinsic evidence were admitted, there is doubt as to what it would show. There is no evidence that the trustees had knowledge of the Johnson gift or of the Link submersible. Nor is there evidence that any of the trustees communicated with the representatives of Smithsonian in any manner.

Under the express terms of the Hunterdon resolution, the Smithsonian had the discretion to select the oceanographic and underwater oceanographic programs to be supported from the gift and in the exercise of that discretion, the Smithsonian could use the funds to support submersibles or other activities at Fort Pierce, without any legal obligation to continue doing so. *See Lefkowitz v. Cornell University*, 35 A.D.2d 166, 316 N.Y.S.2d 264 (1970) (where deed did not require gift to be forever used to support research laboratory for public benefit, University's operation of such laboratory for period of years did not impose legal obligation to continue doing so).

Harbor Branch also seeks to have considered evidence that the Smithsonian commingled or pooled the Johnson and Hunterdon gifts and spent the combined income on the Johnson-Sea-Link project at Fort Pierce in cooperation with Harbor Branch. It proffers such material either as evidence that the two gifts were indeed subject to the same restrictions and that the Smithsonian so understood them, or as evidence, if the Smithsonian did not so understand, that

the Smithsonian's actions were a violation of its fiduciary duty to keep trust assets separate.

The Court rejects the proffer. The trustees' intent as expressed in the December 18 resolution was complete. Thus, extrinsic evidence is inadmissible to contradict or vary that intent. The commingling of the two gifts was not intended by Smithsonian to subject the Hunterdon gift to any of the Johnson gift restrictions. In addition, it would have been legally insufficient to do so. The placement of the two gifts in the same fund, while not the preferred method of administering them, did not constitute a breach of the Smithsonian's fiduciary duties.

The Court also rejects the effort of Harbor Branch to limit the Hunterdon gift by reference to attorney Myers' April 1, 1970 letter to T. Ames Wheeler of the Smithsonian. The December resolution was an integrated expression of the trustees' intention as to the limitations on the gift. Nor was Myers an agent of or an attorney for the trustees for the purpose of establishing its limitations. Indeed, the letter states that Myers was expressing only his own "opinion" as to the treatment to be afforded the Hunterdon gift; it does not say that the Johnson and Hunterdon gifts were subject to the same restrictions.

Accordingly, the Court concludes that the Smithsonian has no present or future obligation with respect to the Hunterdon gift, other than to use the funds for the support of its programs of oceanography including underwater oceanographic activities. The Smithsonian may exercise discretion as to the appropriate means of carrying out these activities pursuant to its statutory mandate to carry out trust responsibilities of the United States "for the increase and diffusion of knowledge among men." [25]

The Court will enter an Order and Judgment consistent with this Memorandum Opinion.

Counsel for the parties shall confer immediately and if possible submit jointly an Order and Judgment by February 11, 1980. If agreement cannot be reached, counsel shall submit separate proposals by February 14, 1980.

**25.** 20 U.S.C. § 41.

## APPENDIX A

OCT 20 1969

**J. SEWARD JOHNSON**
501 GEORGE STREET
NEW BRUNSWICK, N.J. 08903
———
TELEPHONE 201 824-6108

DEFENDANT'S EXHIBIT 17

CA 77-390

October 17, 1969

"THE ULTIMATE RESPONSIBILITY FOR GOOD OR EVIL RESTS WITH THE INDIVIDUAL. THE THINGS THAT ANIMATE HIM AND DISTURB HIM ARE TRANSFERABLE TO THE GROUP AND TO GOVERNMENT. PUBLIC OPINION IS THE ACCUMULATION AND EXPRESSION OF INDIVIDUAL CONCERNS. SO LONG AS THE INDIVIDUAL ALLOWS HIMSELF TO BE PREOCCUPIED BY PERSONAL OR NATIONAL IRRELEVANCIES, HE WILL MAKE NO CONTRIBUTION TO HIS PERSONAL OR THE NATIONAL SURVIVAL. THE EDUCATOR WHO PRIDES HIMSELF ON THE ADVANCED LEARNING HE IMPARTS TO STUDENTS IS ACTUALLY A PURVEYOR OF GROSS ILLITERACY IF HE TRANSMITS NO AWARENESS OF THE DANGER OF WORLD ANARCHY OR THE MEANS BY WHICH IT CAN BE ELIMINATED. THE SCIENTIST WHO STANDS TALL IN HIS PROFESSION IS ACTUALLY A PYGMY IF HE TAKES NO RESPONSIBILITY FOR WHAT HE MAKES. THE TITAN OF INDUSTRY WHO PRESIDES O' 'FICIENT AND HIGH PRODUCTION IS N. L THAN A TRANSIENT SPECTATOR TO THE DEMOLITION OF HIS INDUSTRY IF HE FAILS TO COMPREHEND THE IMPLICATIONS OF A WORLD WITHOUT LAW.

THE BIGGEST LESSON OF ALL TO BE LEARNED ABOUT CONTEMPORARY CIVILIZATION IS THAT NOTHING ANYONE IS DOING TODAY MAKES ANY SENSE UNLESS IT IS CONNECTED TO THE MAKING OF A GENUINE PEACE." -N.C.

REPRINTED WITH PERMISSION
SATURDAY REVIEW
NOVEMBER 8, 1969

Mr. S. Dillon Ripley, Secretary
Smithsonian Institution
Washington, D.C.    20560

Dear Mr. Ripley:

F.I L E D

JAN 31 1970

JAMES F. DAVEY, Clerk

On September 30, 1969, I transferred to the Smithsonian Institution 14,500 shares of Johnson & Johnson stock. This gift is the product of the interest I have had over a long period of time in the wonderful work being done by the Smithsonian in underwater oceanography. It was specifically the outgrowth of a conference that I had in Washington on September 26, 1969, with your deputy, Dr. Sidney Galler, and with Messrs. Wheeler, Powers, and I. E. Wallen, Head, Office of Oceanography and Limnology.

It is my intention in making this gift that the principal shall generally be kept intact and that the income be used in the first instance in assuring the successful completion and operation of the research submersible vehicle being given separately by Edwin A. Link and myself. In the unexpected event that the income and other funds are insufficient to properly equip and operate the submarine, limited emergency use of the principal for this purpose would be appropriate.

Designation of the fund as the "Seward Johnson Trust Fund for Oceanography" is intended to assure that the income should be available for broader use in underwater oceanography beyond the life of the specific submersible mentioned here. In the event that the development of the planned submersible becomes impossible or impractical, I intend that the income will continue to be used for underwater oceanography and, if funds are sufficient, for other oceanographic purposes.

Very truly yours,

J. Seward Johnson
mfp

---

## APPENDIX B

### MINUTES OF SPECIAL MEETING OF
### BOARD OF TRUSTEES
### OF
### THE HUNTERDON MEDICAL CENTER
### SCHOOL OF HEALTH

**DECEMBER 18, 1969**

A special meeting of the Board of Trustees of The Hunterdon Medical Center School of Health was held at New Brunswick, New Jersey, on December 18, 1969, at 2:00 P.M. pursuant to a written Waiver of Notice signed by all the Trustees.

Present were Messrs. P. B. Hofmann, G. O. Lienhard and L. B. Wescott, being all the Trustees of the School. Also present were Garrett M. Heher, the Secretary of the corporation, and John A. DeMarrais, the Comptroller of the School. Mr. Wescott served as Chairman and Mr. Heher as Secretary.

Mr. Wescott pointed out that the reason for the meeting was to consider the dissolution of the School and the transfer of the School's assets, after paying all expenses and other liabilities, to other organizations in accordance with the Certificate of Incorporation. Mr. Lienhard noted, that despite much research and effort since the School's incorporation, it has been unable to achieve fully its objectives and satisfactorily develop the scope of its educational programs beyond those with which it

\* \* \*

Treasurer are hereby authorized to take any other action which may be required or which they may deem necessary to effectuate the dissolution of the School in accordance with the resolutions adopted at this meeting.

Mr. Wescott then pointed out that the remaining question was the distribution of the assets of the corporation after the payment of all its liabilities and the distribution of a portion of its assets as set forth above. Mr. Hofmann suggested that one-half of these assets go to the Rutgers Medical School for the purpose of developing its department of community medicine and projects dealing with the providing of health care. Mr. Lienhard suggested that the balance of these assets be devoted to the educational activities of the Smithsonian Institution in Washington, D.C., which is an agency of the United States Government, particularly to its programs in oceanography. Both organizations qualify as distributees on dissolution under Article D of the School's Certificate of Incorporation. Upon motion duly made and seconded, it was unanimously

RESOLVED that one-half of all of the remaining assets of the School be distributed to the Smithsonian Institute, Washington, D.C., an establishment for the increase and diffusion of knowledge among men, for the support of its programs of oceanography, including the education, research and publication connected therewith with special emphasis on underwater oceanography; and be it

FURTHER RESOLVED that the remaining one-half of the assets of the School be distributed to Rutgers, the State University, as an endowment fund exclusively for the use of the Department of Community Medicine at the Rutgers Medical School for the study and support of projects dealing with the provision of health care to the community, with special interest given to the central New Jersey community, the population served by The Hunterdon Medical Center and the effect on the individual of the provision of health care to the community; and be it

FURTHER RESOLVED that the entire distribution to the Rutgers Medical School shall consist solely of shares of Johnson & Johnson common stock held by the School and that the distribution to the Smithsonian Institute shall consist of the balance of the shares of Johnson & Johnson stock together with all other bonds, securities, cash and other assets remaining after the distribution to the Rutgers Medical School, the Johnson & Johnson common stock to be valued for the purpose of the distribution to the two organizations on the basis of the closing price of the stock on the New York Stock Exchange on December 18, 1969.

There being no further business to come before the meeting, it was, upon motion duly made and seconded, adjourned.

s/ Garrett M. Heher
    Garrett M. Heher, Secretary